[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 6, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-15304

_____

D.C. Docket No. 04-01595-CV-ORL-22-DAB


WILLIAM H. BRUCE, III,

                                        Plaintiff-Appellant,

                    versus

KEVIN BEARY, in his official capacity as Sheriff of Orange County,
RANDALL ROOT, in his individual capacity,
KENNETH GLANTZ, in his individual capacity,
EDWARD KELLY, in his individual capacity, et al.,

                                        Defendants-Appellees.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(September 6, 2007)**

Before CARNES, WILSON, and HILL, Circuit Judges.

HILL, Circuit Judge:

Plaintiff, William H. Bruce, III, appeals the grant of summary judgments to all defendants in this Section 1983 civil rights action for damages resulting from the administrative search of plaintiff's place of business. For the following reasons, we shall vacate the judgments.

## I.

In January of 2001, Zeeshan Shaikh complained to Randall Root of the Auto Theft Unit of the Orange County Sheriff's Department that he had purchased a car from defendant William H. Bruce, III, at his place of business, Wholesale Auto Advantage, Inc., an auto body repair shop and salvage yard (the "Premises").[1] He told Root that the vehicle identification number ("VIN") plate did not match the confidential vehicle identification number ("CVIN") sticker on the car.[2] Root conferred with his supervisor, Kenneth Glantz. The two officers

---

[1] Clifford M. Gager, worked for Bruce as a salesperson/estimator, and testified in his affidavit that the shop was certified by and performed repair work for many insurance companies, including State Farm, Progressive, Allstate, Nationwide, and GEICO Insurance Companies. Their accounts also included Thrifty and Enterprise Car Rental companies, and they were the official body shop for Heintzelman's Truck Center in Orlando. Gager also testified that Bruce and the shop were well respected in the local automotive industry as a "good honest business."

[2] For purposes of determining qualified immunity, the facts are as alleged and supported by affidavits and deposition testimony, and are taken in the light most favorable to the plaintiff. *Bennett v. Parker*, 898 F.2d 1530, 1536 n. 2 (11th Cir. 1990) (Tjoflat, C.J. concurring) ("The court considers in the light most favorable to the plaintiff all facts fairly inferrable from the record – regardless of factual disputes – and decides whether, under those facts, defendant's conduct violated law clearly established at the time"). This recitation of the facts is taken from

decided to conduct an administrative inspection of the Premises, as authorized by Florida Statute § 812.055. The statute permits a warrantless physical inspection of salvage yards and repair shops (among other businesses) during normal business hours "for the purpose of locating stolen vehicles . . .; investigating the titling and registration of vehicles . . .; inspecting vehicles . . . wrecked or dismantled; or inspecting records required [to be kept by such businesses]. *Id.*

On January 15, 2001, at about 10:30 in the morning, Root, Glantz, and Edward Kelly led a group of approximately twenty officers to the Premises. The officers arrived in unmarked trucks and SUVs, and surrounded the entire Premises, blocking all exits. Some of the officers were dressed in SWAT uniforms – ballistic vests imprinted with SWAT in big letters, camouflage pants, and black boots. They entered the Premises with guns drawn – all were armed with Glock 21 sidearms; some carried Bennelli automatic shotguns. When the officers entered the Premises, they ordered the employees to line up along the fence. Vincent Lewis, who was working on a car, felt something touch his back and turned around to find an officer pointing a shotgun at him. The officers patted down and searched the employees. Pockets and purses were searched. The officers took at

the district court's opinion.

least Lewis's driver's license.[3]

Judy Bass, the office manager, testified that she gave the officers paperwork showing that the car purchased by the complaining citizen had mismatched VINs because Bruce had purchased the car with the mismatched VINs from a government theft recovery program and was authorized to resell it that way. Root admitted receiving this paperwork during the search, but testified that it had "no bearing on his investigation."

Bruce arrived at the Premises about ten minutes after the officers. Kelly told him that the officers were there to do an administrative records check. Another officer asked Bruce if he had the titles to all the cars that he had on the lot. Bruce gave the titles to the officer.[4]

Glantz told Bruce to sit in the lounge while they searched a desk in the hallway. In the desk drawer, containing mostly condiment packets, Root found a VIN plate. Glantz asked Bruce if he had any more loose VIN plates. Bruce produced a clear baggie from a locked briefcase in the office containing numerous VIN plates and VIN stickers. Glantz asked Bruce if there were any weapons in the

---

[3]Lewis testified that he was told continually to "shut up" and not to ask any questions. His license was not returned until 3:00 that afternoon.

[4]He has never seen them again.

briefcase and Bruce said "no."[5] Kelly opened the briefcase and found twenty thousand dollars in cash, brass knuckles, a stun gun, and a loaded revolver.[6] Root inspected the VIN plates from the briefcase and discovered one that appeared to be counterfeit.[7] He also found a stack of business cards in the desk that advertised replication of factory VIN decals.

Shortly thereafter, Bruce was arrested and charged with possession of loose VIN plates in violation of Fla. Stat. § 319.30(5)(b),[8] and with operating a "chop shop," in violation of Fla. Stat. § 812.16(2).[9]

---

[5]Although the district court found that Bruce told the officers there was no gun in the briefcase, the court relied upon the officer's incident report for this finding. It is unclear whether this fact is undisputed by Bruce, as he was not asked this question during his deposition. Bruce did testify in his deposition that when dangerous items were discovered in vehicles under repair, he would put them into the locked briefcase for security. For the purposes of this motion, we must take the testimony of Bruce in the light most favorable to him. *Bennett*, 89 F.2d at 1536 n.2.

[6]None of which appears to be illegal in these circumstances.

[7]The number on the plate had sixteen digits, and VINs are seventeen digit numbers.

[8]The statute makes it unlawful "for any person to knowingly possess, sell, or exchange, offer to sell or exchange, or give away any manufacturer's or state-assigned identification number plate or serial plate of any motor vehicle or mobile home that has been removed from the motor vehicle or mobile home for which it was manufactured" and "for any person to authorize, direct, aid in, or consent to the possession, sale, or exchange or to offer to sell, exchange, or give away such manufacturer's or state-assigned identification number plate or serial plate." Fla. Stat. § 319.30(5)(b).

[9]A "chop shop" is "any area, building, storage, lot, field, or other premises or place where one or more persons are engaged or have engaged in altering, dismantling, reassembling, or in any way concealing or disguising the identity of a stolen motor vehicle or of any major component part of a stolen motor vehicle; where there are two or more stolen motor vehicles present; or where there are major component parts from two or more stolen motor vehicles

At approximately 1:00 p.m., the officers began to thoroughly search the Premises. They went through every file, including tax, bookkeeping, and accounting records, and the office computer. They inspected all 150 plus vehicles on the lot – cutting some open with chain saws. These activities – including the detention of at least several employees – continued until after 6:00 p.m.

During their search, the officers discovered two vans owned by Specialty Auto Rentals that had been reported stolen. Ms. Bass testified that she told Root that the vans were not stolen, that they were there for repairs for which the owners never paid, and offered documentation that Bruce had obtained mechanic's liens on the vans. She testified that the officer did not even look at the papers; he just threw them on the ground. Later, further proof of ownership of the vehicles on the Premises (some 150 vehicles had been purchased through the bankruptcy court) was offered and rejected.

The officers found two other cars on the lot with suspicious identification. One had no VIN plate and the other had an altered VIN plate and sticker.

At approximately 6:00 p.m., Root obtained a search warrant in order, he testified, to seize the records and other items at the Premises. Root's supporting affidavit averred that during the course of the administrative inspection, the

present." Fla. Stat. 812.16(2).

6

officers found two vehicles that had been reported stolen and six other vehicles with missing or altered VIN plates. Root also attested that the officers found a briefcase that contained three VIN plates, seven VIN stickers, money, a stun gun, brass knuckles and a revolver, and, in the desk drawer, the business cards.[10]

When Root returned to the Premises with the warrant, he and Glantz seized essentially all property on the Premises – including both business and personal files, tax records, and over 100 vehicle titles and registrations. They took the filing cabinets, copy machine and typewriter. They took the employees' personal tool belts and tools. Root testified that, in all, they seized seven pallets of Bruce's property.

One month later, in February, the Sheriff's Office initiated a forfeiture proceeding as to the property, pursuant to the Florida Contraband Forfeiture Act. After an evidentiary hearing, the Florida circuit court held that the defendants did not have probable cause to seize or retain any of Bruce's property, with the

---

[10]He did not report that he had been told by Judy Bass that the original citizen's complaint that prompted the inspection concerned a theft recovery vehicle or that two of the vehicles reported stolen were subject to mechanic's liens. Root also did not mention that Bruce was in the business of repairing and salvaging automobile bodies, which often requires removing VIN plates and safety stickers, and which is permitted by Florida law. *See* Fla. Stat. § 319.30(5)(c) (providing a safe harbor from prosecution for persons "who remove[], possess[], or replace[] a manufacturer's or state-assigned identification number plate, in the course of performing repairs on a vehicle").

exception of the two vehicles mentioned above for which Bruce could produce no documentation at the hearing.[11]  The court ordered Sheriff Beary immediately to return to Bruce all of the remaining 150 plus vehicles, plus all of the various records, titles, VIN plates, and other property seized.  In March, the Orange County state attorney dropped all criminal charges against Bruce.

Beary did not, however, return Bruce's property.  In May, Bruce and his lawyer at the time went to the Evidence Department of the Orange County Sheriff's Office and requested the return of the property, but Root informed Bruce that the Sheriff's Office would not return all of the property.[12]  Some time later, a Sheriff's Office truck delivered to the Premises some of the items taken during the raid.  The truck driver had the officers' inventory list of property taken from the Premises, and several boxes of items were marked "do not return."[13]  Bruce testified in his deposition in this case that the Sheriff still retains seized items, including car titles, business records, tax files, insurance files, and other financial

---

[11]Bruce testifies that one of these automobiles belonged to a former employee, and Bruce had no legal interest in it.  The court refused to order the return of the other vehicle because Bruce had no documentation for it at that time.

[12]The district court's order observed that "Defendant Root, in defiance of the State Court order, refused to release any of Plaintiff's property."

[13]Gager, Bruce's estimator, was present when the truck arrived, and testified in his affidavit that he questioned the driver about why all the property was not being returned.  He was told to "shut up" or the driver would take all the boxes back and "we would never see them again."

8

records.

In January of 2002, the Florida court of appeals affirmed the circuit court's order to return the property. *Beary v. Bruce*, 804 So.2d 579 (5th DCA 2002).

In 2004, Bruce filed this action, pursuant to 42 U.S.C. § 1983, against Sheriff Beary in his official capacity as the Sheriff of Orange County, and officers Randall Root, Kenneth Glantz and Edward Kelly in their individual capacities. Bruce alleges that the administrative inspection of his Premises constituted an unreasonable search and seizure and, therefore, violated the Fourth Amendment. The district court granted summary judgments to all defendants, holding that there were no constitutional violations and that, even if there were, Sheriff Beary and the officers have valid defenses to this lawsuit.

We review these summary judgments *de novo*. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1242 (11th Cir. 2002). We shall first determine, based upon all facts fairly inferrable from the record,[14] whether the defendants violated Bruce's constitutional right to be free from an unreasonable search and seizure. If so, we shall then determine whether the law provides the Sheriff and the officers with defenses to liability for the violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

---

[14]See note 1, *supra*.

9

**II.**

Defendants assert that their warrantless search of Bruce's Premises was permitted by Florida Statute § 812.055, which authorizes law enforcement to perform "administrative inspections" of automobile body repair and salvage shops. Such administrative inspections do not offend the Fourth Amendment if they are necessary in order to monitor closely regulated businesses for the purpose of learning whether a particular business is conforming to the statute regulating that business. *New York v. Burger*, 482 U.S. 691, 702-03 (1987). The statute authorizing such inspections is constitutional if the state has a substantial interest in regulating the particular business, the inspection is necessary to further the regulatory scheme, and the statute's inspection program, in view of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant. *Id.* The Florida Supreme Court has determined that Florida Statute § 812.055 conforms to these three criteria, *Moore v. Florida*, 442 So.2d 215 (Fla. 1983), and Bruce does not challenge this conclusion.

The warrantless administrative inspection, however, remains an exception to the Fourth Amendment's general rule that a warrant – supported by probable cause and specifying what is to be seized – is required when law enforcement seeks to search private property. The administrative search exception does not confer

authority on law enforcement to ignore the requirement for a warrant where "the primary purpose [of the search or seizure] was to detect evidence of ordinary criminal wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). In *Burger*, the Court rejected the idea that an administrative inspection may be used to gather evidence as part of what is, in reality, a criminal investigation. 482 U.S. at 691 and 716 n. 27. The Court upheld the inspection of Burger's automobile junkyard, in part, because "[t]here [was], furthermore, no reason to believe that the instant inspection was actually a 'pretext' for obtaining evidence of respondent's violation of the penal laws." *Id. See also United States v. Johnson*, 994 F.2d 740, 742 (10th Cir. 1993) (an administrative inspection is a "sham" where it is "a pretext solely to gather evidence of criminal activity").

Furthermore, even when permitted, the Constitution requires that administrative inspections be "appropriately limited." *Edmond*, 531 U.S. at 37. The authorizing statute must "carefully limit[] their time, place, and scope." *Burger*, 482 U.S. at 718 (Brennan, J., dissenting, but noting no disagreement with the Court's "general rule").

Nor may an authorizing statute commit the conduct of such an inspection to the unbridled discretion of the inspector. *Id.* at 703. The statute must "limit the discretion of the inspecting officers" and the inspection must have a "properly

11

defined scope." *Id.* There must be "reasonable legislative or administrative standards for conducting an . . . inspection." *Camara v. Municipal Court*, 387 U.S. 523, 538 (1967). "Where a statute authorizes the inspection but makes no rules governing the procedures that inspectors must follow, the Fourth Amendment and its various restrictive rules apply." *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77 (1970). The fundamental function of these rules is to protect citizens from the "unbridled discretion [of] executive and administrative officers." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 323 (1978).

Bruce contends that the search of the Premises did not abide these limitations. He argues that, from the inception, the search of the Premises was not a routine administrative inspection, but rather an ordinary criminal raid, undertaken with suspicion of a particular crime and implemented to discover and seize evidence of that crime. Prompted by the complaint suggesting that Bruce might be engaged in selling stolen vehicles, Bruce asserts that the officers arrived at his Premises with the specific purpose of finding and seizing evidence of that crime. In this context, he concludes, the Constitution requires that law enforcement arrive with a warrant, not an administrative handbook.[15]

---

[15]The officers carry an "auto theft inspection log packet" that contains a copy of the authorizing statute with an explanation of the scope of the inspection. They asked Bruce's employee to sign the form to acknowledge that he received it.

12

Furthermore, Bruce contends, even if validly undertaken, the administrative inspection of his Premises exceeded what the Fourth Amendment allows. The Florida statute permits the administrative inspection of books, records, and vehicles. It does not, he claims, permit a "para-military raid" on his place of business. Finally, he asserts, the retention of his property after appeal violated the Florida court's order to the Sheriff to return it, and constitutes a separate violation of his Fourth Amendment rights.[16]

What then can be concluded about the search and seizure of Bruce's Premises? Was it undertaken as a valid administrative inspection, as the defendants maintain, or was it, as Bruce claims, an ordinary criminal raid that was unsupported by the constitutionally required warrant? Was it properly limited in scope and execution, or did the officers conduct the inspection with unconstitutionally excessive discretion? Finally, was the failure to return Bruce's property a constitutional violation?

**III.**

1.    <u>Suspicionless Search or Search with Suspicion?</u>

---

[16]Florida law permits the seizing agent to retain the property pending appeal (although we note that the State Attorney had dropped all charges against Bruce prior to the filing of the appeal). *See* Fla. Stat. § 932.704(9)(a). Additionally, we observe that the statute also provides that "[i]f the claimant prevails on appeal, the seizing agent shall immediately release the seized property to the person entitled to possession of the property as determined by the court, pay any costs as assessed by the court . . . ." Fla. Stat. § 932.704(9)(b).

Bruce's first contention is that an administrative inspection, pursuant to an authorizing statute, must be a routine, random, suspicionless visit to a business to inspect books and records. He asserts that any time law enforcement has "particularized suspicion" of illegal activity at a business and seeks to investigate and gather evidence, it must arrive warrant in hand.

Bruce relies heavily on the Supreme Court's 2000 decision in *Edmond*, in which the Court consistently uses the term "suspicionless searches" to characterize administrative searches. 531 U.S. at 37 ("we have upheld brief, suspicionless seizures"). The Court in *Edmond* struck down a drug-interdiction checkpoint because its primary purpose was the detection of "ordinary criminal wrongdoing." *Id.* at 41. The Court said that "when government seeks to ferret out crime, it is fully expected to comply with the Fourth Amendment." *Id.*

Furthermore, the Tenth Circuit's recent decision in *United States v. Johnson*, 408 F.3d at 1321 (10th Circuit 2005), supports Bruce's view. In *Johnson*, the Tenth Circuit stated that when the "evidence of criminal activity [is] so compelling that police have, in essence, probable cause to believe that specific criminal conduct has occurred," they must get a warrant. *Id.* This is so, the court said, because *Burger* "did not endorse a scheme that would allow a warrantless search based on recently discovered evidence that criminal activity had occurred."

14

*Id.* (quoting *S & S Pawn Shop Inc. v. City of Del City*, 947 F.2d 432, 440 (10th Cir. 1991)).  Furthermore, the court said, "inspections of . . . business premises . . . conducted not as part of a pre-planned and dispassionate administrative procedure but instead pursuant to direct criminal suspicion . . . give [ ] cause for grave constitutional concern."  *Id.* (quoting *S & S Pawn Shop*, 947 F.2d at 441).

The Eighth Circuit has also recognized the danger of allowing administrative searches to become "pretexts for 'crime control.'"  *United States v. Knight*, 306 F.3d 534, 537 (8th Cir. 2002) (holding unconstitutional the administrative search of personal belongings conducted in that case).

We share our sister circuits' concern that the administrative search exception not be allowed to swallow whole the Fourth Amendment.  *See Swint v. City of Wadley, Ala.*, 51 F.3d 988, 998 (11th Cir. 1995) ("Even in the context of administrative searches of business property, however, the Fourth Amendment limits warrantless searches").  Unless the warrant exception for administrative inspections of pervasively regulated businesses means that under *no* circumstances is law enforcement required to secure a warrant prior to entry, at some level of suspicion a warrant *is* required.[17]  In this era of the pervasive regulation of most

---

[17]Judge Carnes, in his concurrence, highlights this issue, which, although unnecessary for us to decide, nonetheless raises important constitutional concerns.

15

businesses, to interpret the exception otherwise might well give cause for general alarm.[18]

We need not, however, address today the question of where to draw that line, because we hold that under the circumstances of this case the officers did not cross it. The Supreme Court has made quite clear that an administrative search is not rendered invalid because it is accompanied by *some suspicion* of wrongdoing. In *United States v. Villamonte-Marquez*, 462 U.S. 579, 584 n. 3 (1983), the Court approved an administrative search that was prompted by an informant's tip that a vessel was carrying marijuana, noting that there was "little logic in sanctioning . . . examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers" (quoting *United States v. Arra*, 630 F.2d 836, 846 (1st Cir. 1980)).

We too have approved administrative searches in response to information giving rise to some suspicion of illegal activity. *Crosby v. Paulk*, 187 F.3d 1339, 1348 and n. 12 (11th Cir. 1999). In *Crosby*, officers conducted the administrative inspection of a nightclub as part of an ongoing criminal investigation into

---

[18]This is especially true given the Supreme Court's apparent abandonment of its earlier caveat in *Colonnade,* 397 U.S. at 77, that the exception applies only to *historically* pervasively regulated businesses. *See Burger*, 482 U.S. at 705-06. *See also* Justice Stevens concurrence in *Donovan v. Dewey*, 452 U.S. 594, 610 (1981) (pervasive regulation alone insufficient to legitimize warrantless entry).

16

underage drinking and other alcohol violations. *Id.* at 1342. *See also United States v. Thomas*, 973 F.2d 1152, 1155-56 (5ᵗʰ Cir. 1992) (administrative searches do not violate Constitution simply because of the existence of specific suspicion of wrongdoing); *United States v. Nechy*, 827 F.2d 1161, 1167 (7ᵗʰ Cir. 1987); *Arra*, 630 F.2d at 846.

Even in *Johnson*, in which the Tenth Circuit cautioned against administrative searches in the service of particularized suspicion, the court upheld the warrantless search at issue in the case, concluding that the officers did not have "direct criminal suspicion" of wrongdoing. 408 F.3d at 1321.

Similarly, in this case, the officers did not have "direct criminal suspicion" of wrongdoing. They received a criminal complaint regarding possible VIN violations at Bruce's auto body shop. This information alone did not rise to the level of probable cause that would have supported application for a warrant. In the absence of such direct criminal suspicion, the officers validly invoked their statutory authority to inspect Bruce's Premises to determine whether he was operating in accordance with Florida law governing use of VIN plates. Merely because the officers had "an objectively reasonable basis to suspect they might find stolen cars or car parts in their inspection does not invalidate that inspection." *Id.* at 1323. Therefore, we hold that defendants were permitted to conduct a

17

warrantless administrative inspection of Bruce's Premises for the purpose of investigating VIN violations.[19]

2.      Administrative Inspection or Criminal Raid?

More troubling, however, is the officers' execution of the administrative inspection of Bruce's Premises. Officer Root's own testimony raises doubt that the conduct of the inspection was either "routine" or "administrative." Root testified that § 812.055 neither authorizes nor does he understand an appropriate

_____

[19]Bruce also suggests, however, that the officers' conduct evidenced their intention to "put him out of business." In fact, he claims they did just that. While the officers' "subjective intentions play no role in ordinary probable-cause Fourth Amendment analysis," *Whren v. United States*, 517 U.S. 806, 813 (1996), the *Edmond* Court explicitly held that "programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion," such as administrative inspections. 531 U.S. at 45-46. The Court said that "[w]hile reasonableness under the Fourth Amendment is predominantly an objective inquiry, our special needs and administrative search cases demonstrate that purpose is often relevant when suspicionless intrusions pursuant to a general scheme are at issue." *Id.* at 47. Therefore, while the officers' suspicion about Bruce's business practices did not negate their statutory authority to conduct a warrantless inspection of his Premises, neither does such suspicion insulate them from liability if they had the illegal purpose of eliminating a disfavored business from the community.

On remand, the question of whether this administrative search was a pretext for an illegal purpose is a factual question. *Johnson*, 994 F.2d at 743 (citing *Abel v. United States*, 362 U.S. 217, 225-30 (1960)). The wholesale seizure of virtually everything on Bruce's Premises (and the disinterest of the officers in proffered documentation of vehicle ownership) and the failure to return Bruce's property (especially after conclusion of the state court appeal) may be some evidence of illegal pretext. *See United States v. Mahaney*, 105 F.3d 670 (10th Cir. 1997)(affirming district court's finding of pretext based in part upon the officers' failure to examine Mahaney's buy/sell register to determine whether he was legally in possession of the vehicles and parts with altered VIN plates). So, too, may Root's testimony that "[m]y intent was to shut down a chop shop."

A factual finding of pretext would require, of course, the legal conclusion of unconstitutional unreasonableness. *Burger*, 482 U.S. at 691.

18

administrative inspection to include: the use of a SWAT team, or the searching and prolonged detention of employees. Root Deposition (R-73-24).[20] Glantz similarly testified that it is not part of a typical administrative search to patdown and search employees. Glantz Deposition (R-75-20). Glantz further testified that he had no reasonable suspicion to patdown the employees. Root testified that it was not part of a normal administrative inspection to arrive with guns drawn. (R-74-34).

Furthermore, in marked contrast to the "inspection" under review, Ms. Bass testified that during a previous administrative inspection of the Premises, "two very polite gentlemen" came into her office, showed identification, asked for certain records, examined them briefly and left. The whole inspection lasted approximately 15 minutes. She testified that the previous inspection in no way resembled the "inspection" under review in this case, which she characterized as a "criminal raid."

Defendants, on the other hand, assert that even if they conducted the inspection as alleged by Bruce, they did no more than necessary to further

---

[20]Root was asked whether "when you go for a records inspection you can't handcuff people?" to which he responded, "correct." He was asked to confirm that he is not permitted during an administrative inspection to "line the employees up against the fence" or "pat them down" or detain them and he responded "correct." He testified that these actions are "outside the scope of what we do." Root denied that any of these events occurred.

Florida's regulatory interest over stolen automobiles, and, therefore, did not exceed the limits of their discretion under the statute.

Defendants conceded at oral argument, however, that not every warrantless search of a closely regulated business inspection is constitutional, and that the test of a proper administrative search is its reasonableness.

As we observed above, administrative searches are an exception to the Fourth Amendment's warrant requirement, but they are not an exception to the Fourth Amendment's requirement for reasonableness. *Donovan*, 452 U.S. at 598-99; *Swint*, 51 F.3d at 998. In the very case in which the Court recognized the permissibility of warrantless administrative inspections, it invalidated the actual inspection conducted in the case because the inspectors' search exceeded their discretion under the authorizing statute. *Colonnade*, 397 U.S. at 77 (disapproving the use of force to open locked door).

As with any search, then, the scope and execution of an administrative inspection must be reasonable in order to be constitutional. Although a statute authorizing administrative searches may be constitutional, actual searches conducted under that authority may not. The question we must resolve, then, is whether the conduct of the administrative inspection of Bruce's Premises was reasonable.

20

This administrative inspection was conducted by 20 officers over a period of eight hours.[21]  The officers arrived at Bruce's auto body shop in unmarked vehicles, surrounded the property and blocked the exits with their vehicles.  They entered the office with automatic shotguns and sidearms drawn.  They searched and detained employees.[22]

This hardly seems to be what the Supreme Court had in mind in *Burger* when it held that the Constitution is not offended by statutes authorizing the regular, routine inspection of books and records required to be kept by auto salvagers.  482 U.S. at 711-12.[23]  A jury might find it hard to disagree with office manager Bass's conclusion that this conduct resembled a criminal raid more than an administrative inspection.

We have previously invalidated a similar administrative search, holding that it was unreasonably excessive in execution.  In *Swint*, we reviewed two raids,

_____

[21]As noted previously, defendants dispute these facts, but concede them for the purpose of the qualified immunity analysis.

[22]Although Bruce may not assert the rights of his employees who may have been unconstitutionally searched, any violation of their rights is not the focus of our inquiry.  How the officers treated the employees is relevant to our determination of whether their conduct exceeded the scope of a proper administrative inspection.

[23]The Court noted that the inspection of Burger's auto salvage yard appeared to have been made at random in the regular course of business.  482 U.S. at 694 n. 2.  On any given day, the Auto Crimes Division of the New York City Police Department conducted from five to ten inspections of automobile salvage yards.  *Id*.  The junkyards designated for inspection were selected from a list of such businesses compiled by New York City police detectives.  *Id.*

conducted by approximately 30-40 officers on two separate occasions at a nightclub. 51 F.3d at 992-93. During both raids, SWAT team officers participated, and some of the officers pointed their weapons at club employees and patrons. *Id.* Officers searched and detained employees and patrons until the raids, which lasted approximately one and one-half hours, were over. *Id.* Employees were refused permission to go to the restroom. *Id.*

In rejecting defendants' claim that they had merely conducted an administrative search, we held that the "massive show of force and excessive intrusion" evidenced in these raids was in marked contrast to other administrative inspections of the club, and that "[n]o reasonable officer in the defendants' position could have believed that these were lawful, warrantless administrative searches." *Id.* at 999. We specifically recognized that "'prior cases have established that the Fourth Amendment's prohibition against unreasonable searches applies to administrative inspections of private commercial property.'" *Id.* at 998 (quoting *Donovan*, 452 U.S. at 598).

Defendants protest that *Crosby* is the more apposite circuit precedent. In *Crosby*, however, the officers went to the nightclub with valid warrants to arrest the Crosbys for violations of Georgia laws relating to alcohol sales. 187 F.3d at 1342. While there, they performed an administrative inspection of the books and

22

records of the club, looking for Sunday alcohol sales violations and checked all patrons' identifications for underage drinking. *Id.* at 1343. In approving this inspection, we specifically distinguished the *Crosby* inspection from that in *Swint* because "in both of the raids in *Swint* . . . law enforcement officers [arrived] with SWAT team officers, all of whom aimed their weapons at nightclub owners and employees as well as patrons." *Id.* at 1350. Furthermore, we noted that, in *Swint*, "patrons were prohibited from moving or leaving until the officers [completed their search]." *Id.* In concluding that the *Crosby* inspection did not exceed its proper scope, we reiterated that the officers "checked identifications of approximately 400 patrons, made approximately 70 arrests of underage patrons for consuming alcohol, which resulted in 54 convictions" and all this was accomplished "without displaying their weapons." *Id.*

The administrative search at issue in this case more closely parallels that in *Swint* than it does that in *Crosby*. The "massive show of force" in this case, like that in *Swint*, is not the sort of conduct that was approved by the Supreme Court in *Burger*. In *Burger*, five plainclothes officers arrived at Burger's junkyard and asked to see his business license and his "police book." After determining that there were stolen vehicles on the premises, they arrested Burger. There were no guns drawn, no overwhelming display of force, and no detention, search or seizure

23

of employees. This is the sort of search that seems to deserve the label "administrative inspection."

On the other hand, the searches in *Swint* and as claimed in this case deserve to be called what they were – criminal raids. The inspection of books and records, of automobile titles and VIN numbers does not require exits to be blocked, an automatic shotgun to be stuck into an employee's back, employees to be lined up along a fence and patted down and deprived of their identification. None of this conduct is either routine or administrative. It is the conduct of officers conducting a raid.

Nor is there any evidence in the record, and defendants do not argue in their brief or at oral argument, that there was any reason to expect that force was required to conduct the administrative inspection of Bruce's Premises. Defendants point to no evidence that they had any reason to believe that their inspection would be met with resistance or defiance.

Similarly, in *Turner v. Dammon*, 848 F.2d 440, 446 (4th Cir. 1988), the Fourth Circuit disapproved officers' conduct in performing over 100 administrative inspections of a particular bar because there was no evidence in the record to support the need for such repeated searches. The court framed the issue as "whether [the officers] exercised unbridled discretion in conducting [over 100

searches], thereby effecting the type of 'unreasonable' intrusion that the Fourth

Amendment forbids." *Id.* The court said that repeated searches might be

reasonable:

> [I]f the record established that the large and disproportionate number of searches at [the bar] was objectively supported by numerous arrests, by reports of criminal activity there, or even by logs detailing the subject of complaints by patrons, passersby, or neighboring establishments to which the officers had responded.

*Id.* at 447. The record in *Turner* was, however, devoid of such support, containing

only the officer's "unsubstantiated statements" that the inspections were

necessary. *Id.* at 445.[24]

In this case, too, we have such unsubstantiated assertions. At oral

argument,[25] defendants asserted that "chop shops" are "dangerous places." This

may well be so. But Wholesale Auto Advantage was not then, nor is it now, a

chop shop. It has never been determined to be anything other than a legitimate

auto body repair shop.[26] If defendants had information supporting a reasonable

---

[24]The officer testified that an unusual number of calls for police service were made from the bar.

[25]But not in their brief.

[26]The state attorney dropped all criminal charges against Bruce, and the Florida court ordered his vehicles, and all other property – including loose VIN plates – returned. Root conceded in his testimony that Wholesale Auto Advantage has never been determined to be a chop shop.

25

expectation that their arrival at Bruce's Premises needed to be a para-military operation, then we would be in a position now to evaluate the reasonableness of their conduct. Absent some such showing, we are not. As the *Turner* court observed:

> It is this utter absence of objective justification for the [conduct of the inspection] that raises constitutional concerns. The two officers offer no basis from which any reviewing authority can gauge the reasonableness of their actions. That, of course, is the very definition of official lawlessness and the very behavior that the Fourth Amendment, by its express terms, forbids.

848 F.2d at 445.

At least one other court has enforced a similar reasonableness requirement on an administrative inspection of an automobile salvage yard. In *Lewis v. McMasters*, 663 F.2d 954, 955 (9th Cir. 1981), the Ninth Circuit observed that California courts had upheld an authorizing statute's validity on the ground that, properly construed, the section applied only to searches made "under reasonable circumstances, within constitutional limitations." (internal quotations omitted). In holding the administrative search of the automobile salvage yard in that case unconstitutional, the court said that it was unreasonable because the officers searched beyond the scope of that permitted by the statute. *Id.*[27]

---

[27]The officers seized a steel drum filled with old metal parts under a statute permitting inspection of vehicles, titles and registrations. 663 F.2d at 954 and n. 1.

26

The Seventh Circuit, in upholding the constitutionality of an Illinois statute permitting warrantless inspections of automobile parts dealerships,  explicitly stated that it did not "lightly dismiss" the "specter of bureaucratic abuses" suggested by testimony in the district court regarding such abuses perpetrated by state officials conducting administrative inspections.  *Bionic Auto Parts and Sales, Inc. v. Fahner*, 721 F.2d 1072, 1080-81 (7th Cir. 1983).  The court, however, observed that these abuses could be remedied on a case-by-case basis.  *Id.* at 1081 n. 4.

Courts have found administrative searches to have exceeded their constitutional bounds in other contexts, as well.  The Third Circuit held that an administrative inspection that involved eight armed and uniformed officers who descended on a taxidermist's office and residence, and conducted an "exhaustive search of [the defendant's business] had "all the hallmarks of a purely criminal investigation."  S*howers v. Spangler*, 182 F.3d 165, 173 (3d Cir. 1999). Observing that the warrant exception for administrative searches is "extremely limited," the court noted that the authorizing statue limited the inspection to books and records, and that it did not confer the type of "sweeping search power" claimed by the officers.  *Id.*  The court held that there is a constitutional difference "between an inspection of records, for which no warrant was required, and a

27

[general] search for which a warrant was always required, absent consent from the person being searched." *Id.* at 173 n.11. The court noted that the testimony of the officers in that case – that an inspection is not the same as a general search – corroborated its conclusion. *Id.* at n. 11.

In this case, too, we have a search that extended far beyond the statutory authorization. Not just vehicles were searched; everyone on the Premises was.[28] Not just VIN plates were seized; driver's licenses were also. Not just records were seized; employees were detained for ten hours. We conclude, as did the Third Circuit in *Spangler*, that the scope and conduct of the search in this case had all the hallmarks of a purely criminal investigation. Such an administrative inspection is not reasonable.

The Eighth Circuit has also enforced limits on the scope of an administrative inspection. *United States v. Knight*, 306 F.3d 534 (8th Cir. 2002). In *Knight*, the court held that an officer's search of a trucker's briefcase sitting on the seat beside him when stopped for an administrative regulatory inspection, "quite obviously exceeded the authority invested in him by the [inspection program]." *Id.* at 536. The court said that "[w]e believe that, as a general matter,

_____

[28]Again we note that the relevance of the searches of the employees is not that their constitutional rights may have been violated, but rather we consider this fact as relevant to the determination of whether the officers exceeded the proper scope of an administrative inspection.

28

rummaging through a person's belongings is more likely to serve the purpose of general 'crime control' than the enforcement of a regulatory scheme." *Id.* at 537.[29] The court concluded that such a search of personal belongings must be authorized by a warrant or probable cause. *Id.*[30] In the search at issue in this case, employees' personal belongings were similarly and unreasonably rummaged through.[31]

Similarly, the Virginia Court of Appeals held unreasonable a search of miners for smoking materials, justified by the Commonwealth as a permitted administrative inspection pursuant to state statutes authorizing safety inspections of the mining industry. *Commonwealth v. Burgan*, 450 S.E.2d 177, 180 (Va. App. 1994). The Virginia court said that the warrant exception applied to the search of commercial premises, not to the search of employees, whose "expectation of privacy remains undiminished by the statutes." *Id. But see Anobile v. Pelligrino*, 303 F.3d 107, 123 (2d Cir. 2002) (holding patdowns of race track employees did

---

[29]The court observed that the pretext doctrine was reaffirmed by the Supreme Court in *Edmond.* 306 F.3d at 537.

[30]The court said that if there had been some indication by the trucker that the briefcase might contain contraband the search may have been justified by probable cause. 306 F.3d at 537.

[31]We are aware that the Tenth Circuit approved the search of an employee's personal toolbox in *Johnson*. 408 F.3d at 1322. The court did not find this conduct unreasonable because the "officers had at least a reasonable suspicion that the toolbox might contain something relevant to their administrative search." *Id.*

not exceed permissible scope of the administrative search where object was to find performance enhancing drugs and syringes for injecting horses).

We do not by our holding here today intend to impair Florida law enforcement's statutory authority to conduct administrative inspections of automobile salvage yards. We agree with the Fourth Circuit that "the burden on law enforcement officials in conforming their conduct to Fourth Amendment standards is not great in the area of traditionally regulated industries." *Turner*, 848 F.2d at 447.

Because administrative searches require no warrant, however, they invest law enforcement with the power to invade the privacy of ordinary citizens. *United States v. Bulacan*, 156 F.3d 963, 967 (9th Cir. 1998). "This power carries with it a vast potential for abuse." *Id.* Because of this potential for abuse, judicial review must fulfill its constitutional duty to ensure that the Fourth Amendment's requirement for reasonableness in the conduct of such searches is not obliterated by the statutory exception to its requirement for a warrant. Under certain limited circumstances, the Constitution permits warrantless administrative searches. It never permits unreasonable ones.

In reviewing the search of Bruce's Premises, then, we have balanced the administrative need to search against the invasion that the search entails. "To

meet the test of reasonableness, an administrative screening search must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it." *Id.* (quoting *United States v. Davis*, 482 F.2d 893, 910 (9th Cir. 1973)). The facts in this case, as alleged in Bruce's complaint, supported by evidence in his affidavits and deposition transcripts submitted in opposition to the defendants' motions for summary judgment, taken in the light most favorable to him, are sufficient to raise genuine issues of material fact for trial as to whether defendants' conduct violated his Fourth Amendment right to be free from unreasonable administrative search and seizure. Under the Florida statute, the officers were entitled to visit Bruce's Premises to inspect Bruce's vehicles, titles and registrations and related records. If the evidence at trial supports Bruce's allegations, it is clear that this limited scope of their authorization under the statute was substantially exceeded.

If the inspection of Bruce's Premises was unlawful from its inception or in its execution, then nothing discovered in the ensuing search could have been used to support the required probable cause to arrest Bruce or seize the seven pallets of his property. *Mapp v. Ohio*, 367 U.S. 643 (1961); *United States v. Valdes*, 876 F.2d 1554, 1559 (11th Cir. 1989) (warrantless arrest and seizure dependent upon probable cause); *State v. Pomerance*, 434 So. 2d 329, 330 (Fla. 2d DCA 1983).

Certainly, the continued retention of his property after conclusion of the appeal would be a constitutional violation as well.[32]

In so deciding, we do not hold that under no circumstances would an administrative search similar to that alleged in this case be reasonable. We hold only that, under the facts of this case, the administrative search of Bruce's Premises exceeded its limited scope and was, therefore, unreasonable, as was the seizure of his property and the refusal to return it.

Having so held, we must now determine whether Sheriff Beary may be held liable for the possible constitutional violations of his officers, and whether the officers are entitled to qualified immunity from this lawsuit.

## IV.

1.  The Sheriff's Policies

The Sheriff, sued in his official capacity, can be liable under Section 1983 for conduct in which he did not personally participate if he failed to train adequately his officers in the proper conduct of an administrative search, and this failure reflects a "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) (footnote omitted); *see also Zatler v. Wainwright*, 802 F.2d 397 (11th Cir.

---

[32]As already held by the district court.

1986).[33]  Deliberate indifference may be established by a pattern of constitutional violations, *City of Canton*, 489 U.S. at 397 (O'Connor, J., concurring in part) or even by a single decision under "appropriate circumstances."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).  The Supreme Court has said that "in light of the duties assigned to specific officers or employees [where] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, then the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *City of Canton*, 489 U.S. at 390.

Should constitutional violations be found at trial in this case, Sheriff Beary's liability will depend upon whether he failed to train adequately his officers in the proper execution of an administrative inspection, and whether this failure permitted or encouraged his officers' unconstitutional conduct of the administrative inspection of Bruce's Premises.  Whether Sheriff Beary had such a policy is a question of fact.  *City of Canton*, 489 U.S. at 392; *Gould v. City of*

---

[33]Sheriff Beary, sued in his official capacity, is not, of course, entitled to, nor has he asserted, the individual capacity defense of qualified immunity.  Furthermore, ''where a plaintiff brings an action against a public official in his official capacity, the suit is against the office that official represents, and not the official himself."  *Welch v. Laney*, 57 F.3d 1004, 1009 (11th Cir. 1995).

*Miami*, 151 F.3d 1346, 1351 (11ᵗʰ Cir. 1998).[34] On remand, this issue will remain to be resolved.

With respect to the failure to return Bruce's property to him after appeal, despite the state court order to do so, we emphasize that even a single decision by its policymaker may subject the county to liability for a constitutional violation. *Pembaur*, 475 U.S. at 480. As the final decision-maker in the Sheriff's Department, *see Hufford v. Rodgers*, 912 F.2d 1338 (11ᵗʰ Cir. 1990), the Sheriff had the responsibility to see that Bruce's property was returned – all of it. As such, the district court erroneously held that Bruce is required to demonstrate that the Sheriff had some policy of retention in order to establish a constitutional violation.

## 2.    The Officers' Entitlement to Qualified Immunity

Having concluded that the facts alleged support a finding of a constitutional violation in connection with the conduct of the administrative search of Bruce's Premises, the officers are entitled to qualified immunity only if the law regarding the proper scope of administrative searches was not clearly established at the time the search was conducted. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The

---

[34]Root testified that he received no training from the Orange County Sheriff's Department relating to either the propriety or scope of administrative inspections. Rather, the scope of the search was left to his "common sense." This testimony was corroborated in the depositions of Kelly and Glantz. Ronald Stucker, Orange County's Chief of Professional Standards and Criminal Investigation, testified that he was not familiar with any Orange County training relating to administrative inspections.

34

district court held that it was not. We disagree. Both *Burger* and *Edmond*, decided before the instant search, made clear that administrative searches are governed by the Fourth Amendment's requirement for reasonableness. This limitation was applied by us in *Swint*, in which we held unreasonable a similarly excessive and intrusive administrative search. As such, it was clearly established that an administrative search must be reasonable under the circumstances and may not exceed its limited scope. Therefore, we hold that the grant of qualified immunity to the officers was improvident.

## V.

In sum, we hold that the facts as alleged herein create a genuine issue of material fact as to whether the administrative inspection in this case was reasonable, as required by the Fourth Amendment. We also hold that there is a similar issue for trial with respect to the claimed retention of Bruce's property after appeal. Finally, we hold that Bruce has created a triable issue of fact with respect to the existence of a policy of failure to train the officers that, upon resolution, may subject the Sheriff to liability in his official capacity. We also hold that the officers are not entitled to qualified immunity from this lawsuit.

Accordingly, the judgment of the district court is vacated in all respects and the case is remanded to the district court for further proceedings consistent with

this opinion.

**VACATED AND REMANDED.**

CARNES, Circuit Judge, concurring:

I concur in the Court's conclusion that the search conducted in this case violated the plaintiff's Fourth Amendment rights, but I do not join in all that is said about that issue in the majority opinion.

There was a Fourth Amendment violation in this case because the scope of the law enforcement intrusion exceeded that which is permissible during an administrative search alone. What happened in this case was more of a full scale raid and the kind of prolonged, top to bottom search that requires a warrant than it was an administrative search permitted to determine compliance with laws applicable to a closely regulated business. See Swint v. City of Wadley, Ala., 51 F.3d 988, 998–99 (11th Cir. 1995).

The reason I cannot join the majority opinion is its hand-wringing dicta suggesting that otherwise valid administrative searches may not be permissible if there is too much basis for suspecting that evidence of a crime will be found during the search. The theme of Part III of the majority opinion seems to be that when it comes to administrative searches a little suspicion is okay, but a lot is not. To the contrary, I tend to think that this is one area covered by Mae West's observation that: "Too much of a good thing is wonderful." The more reason to believe a crime has been committed, the better.

37

The notion that the permissibility of an administrative search varies inversely with the reason to believe that the search will uncover evidence of a crime defies logic and finds no support in the law.  It is illogical because the more basis for believing a crime has been committed and that evidence of it can be found, the more justification there is for the search.   In the area of searches probable cause is a positive factor, not a negative one; a plus, not a minus.

The Supreme Court was presented with an issue of this type in United States v. Villamonte-Marquez, 462 U.S. 579, 103 S. Ct. 2573 (1983), which involved a warrantless search by customs officials of a large sailboat anchored in a shipping channel.  Id. at 580–81, 103 S. Ct. at 2575.  The search was conducted  pursuant to a statute allowing them to board and inspect the vessel's manifest and documentation.  Id.  One of the defendant's contentions was that the search was not motivated by concern about the vessel's paperwork, but instead grew out of an informant's tip that a ship loaded with marijuana would be coming through that channel.  Id. at 584 n.3, 103 S. Ct. at 2577.  For that reason, the customs officials were accompanied by a state law enforcement officer.

In their appeal from convictions for various crimes relating to the importation of marijuana, the defendants in Villamonte-Marquez argued that the evidence of drugs found on board should be suppressed, "because the Customs

officers were accompanied by a Louisiana State Policeman, and were following an

informant's tip that a vessel in the ship channel was thought to be carrying

marijuana, they may not rely on the statute authorizing boarding for inspection of

the vessel's documentation." Id.  In rejecting that argument, which closely

parallels the  majority's dicta in this case, the Supreme Court explained:

> This line of reasoning was rejected in a similar situation in Scott v.
> United States, 436 U.S. 128, 135–39, 98 S. Ct. 1717, 1722–24 (1978),
> and we again reject it.  Acceptance of respondent's argument would
> lead to the incongruous result criticized by Judge Campbell in his
> opinion in United States v. Arra, 630 F.2d 836, 846 (1st Cir. 1980):
> "We would see little logic in sanctioning such examinations of
> ordinary, unsuspect vessels but forbidding them in the case of
> suspected smugglers."

Id.

The "incongruous result" rejected by the Supreme Court in

Villamonte-Marquez is the same one that would flow from ruling out

administrative searches of regulated businesses that are motivated by suspicion

rising to the level of probable cause to believe there is criminal activity afoot.  To

borrow the words that the Supreme Court borrowed in explaining its

Villamonte-Marquez decision, "We would see little logic in sanctioning such

examinations of ordinary, unsuspect [auto salvage businesses] but forbidding them

in the case of suspected [chop shops]."  Id.

The Fifth Circuit's decision in United States v. Thomas, 973 F.2d 1152 (5th

Cir. 1992), is similar to our case, and there the court relied on <u>Villamonte-Marquez</u> to hold that a public safety investigator's search of an auto salvage yard pursuant to an administrative search statute did not violate the Fourth Amendment. <u>Id.</u> at 1155–56. The investigator searched the business after tracking a salvage vehicle there. <u>Id.</u> at 1155. During the search, the officer inspected other vehicles on the lot and seized one along with some VIN plates. As a result of that and other evidence which flowed from it the defendant was convicted on fourteen counts of trafficking in vehicles with falsified identification numbers. <u>Id.</u>

The defendant in <u>Thomas</u> argued on appeal that the search of his business violated the Fourth Amendment because it was not a valid administrative search because it was not conducted as part of a scheme of periodic and frequent inspections, but instead was intended to gather information about specific vehicles. <u>Id.</u> In rejecting that argument the Fifth Circuit explained that, "[a]dministrative searches conducted pursuant to valid statutory schemes do not violate the Constitution simply because of the existence of a specific suspicion of wrongdoing." <u>Id.</u> at 1155–56.

Also helpful is the decision in <u>United States v. Nechy</u>, 827 F.2d 1161, 1167 (7th Cir. 1987), which rejected the argument that an administrative search of a pharmacy was unconstitutional because it was motivated by suspicion that the

40

pharmacist was engaged in criminal activity and a desire to build a case against him. As the Seventh Circuit explained, "it does rather turn the Fourth Amendment on its head to complain about not the dearth but the plethora of grounds for believing that a pharmacy that is to be inspected is involved in criminal activity." Id.

Our own closest decision to the issue is Crosby v. Paulk, 187 F.3d 1339 (11th Cir. 1999), which involved a 28 U.S.C. § 1983 action that the owners and manager of a nightclub brought against a sheriff, a drug task force commander, and a state revenue agent, claiming a violation of the Fourth Amendment. Id. at 1344. The defendants had received numerous complaints about underage drinking at that and an adjoining nightclub owned by the plaintiffs. Id. at 1324. They knew those two clubs were among the most serious violators of underage drinking laws in the area, and there was enough evidence of those violations that the defendants had already obtained arrest warrants for the clubs' owners and manager. Id.

The defendants teamed up to carry out an operation involving about forty law enforcement officers, which had two purposes: conducting an administrative search to see if underage and Sunday alcohol sales were still occurring, and executing the arrest warrants that had been obtained for past violations. Id. at 1343. Inside the premises, the officers detained approximately 400 patrons and

41

required them to prove their age.  Id.  They checked business records and inspected equipment. Id.  The search lasted about two hours and resulted in fifty-four convictions for underage drinking.  Id.

As part of their § 1983 lawsuit the plaintiffs claimed that the administrative search was per se unreasonable under the Fourth Amendment.  Id. at 1345.  We disagreed.  Id. at 1348.  In doing so we specifically rejected the plaintiff's argument that since the search had been planned in advance, the officers should have used the available time to obtain a search warrant.  Id.  We said, among other things, that "[i]t is not our role to tell local governments how to conduct an administrative search to enforce the Georgia Alcoholic Beverage Code as to underage and Sunday alcohol sales." Id.

In rejecting the argument in Crosby that the administrative search was improper because the officers could have obtained a search warrant, we did not quarrel with the premise that the officers had enough time and evidentiary basis to obtain one.  Given the facts of that case it is clear that there was probable cause aplenty for a search warrant.  See id. at 1342–43.  Still, we upheld the administrative search.  Id. at 1348.  Our Crosby decision refutes the proposition that administrative searches may not be conducted if there is enough probable cause for a search warrant.

42

In the face of our own <u>Crosby</u> decision and the Supreme Court's decision in <u>Villamonte-Marquez</u>, as well as the Fifth and Seventh Circuit decisions, the primary decision that the majority relies on for its counterintuitive concern that too much evidence of criminality ("at some level of suspicion" Maj. Op. at 15) will defeat an otherwise permissible search is <u>United States v. Johnson</u>, 408 F.3d 1321 (10th Cir. 2005). Maj. Op. at 14–15. To begin with, a holding from another circuit cannot undermine the holdings from our own circuit and the Supreme Court, which we have discussed.

Not only that, but the Tenth Circuit did not hold in <u>Johnson</u> that a high level of suspicion, or even probable cause, to believe that specific criminal conduct has occurred rules out an administrative search and requires a warrant. The language from the <u>Johnson</u> opinion that the majority cites for its own dicta favoring that proposition is not a holding, but is itself dicta. It is dicta because the Tenth Circuit in <u>Johnson</u> actually upheld the administrative search in that case. 408 F.3d at 1315, 1321–22. It is dicta because the facts of the <u>Johnson</u> case did not even rise to the level of direct criminal suspicion, much less probable cause. <u>Id.</u> at 1321 ("This is not the case here. Here, officers did not have 'direct criminal suspicion' about [the defendant] or [the auto salvage yard].").

Even if the Tenth Circuit's statement in <u>Johnson</u> were the law of that circuit,

43

our Crosby decision shows that it is not the law of this circuit. And the Supreme Court's decision in Villamonte-Marquez shows that it ought not be the law anywhere. Adopting the proposition that more suspicion means less administrative search authority would, as the Supreme Court explained, lead to the incongruous result of encouraging searches of businesses not suspected of illegal conduct while discouraging searches of those suspected of crimes. There is enough illogic in life without promoting it in the law.