[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11041
Non-Argument Calendar
_____

D.C. Docket No. 2:12-cv-00039-SPC-CM

THE INDIGO ROOM, INC.,
RAIMOND AULEN,
DYLAN JONES,

Plaintiffs-Appellants,

versus

CITY OF FORT MYERS,
DOUGLAS BAKER,
FMPD Chief, in his individual capacity,
ALAN GAGNON,
FMPD Officer, Badge No. 299, in his individual capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(October 16, 2014)

Before TJOFLAT, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

Plaintiffs-appellants The Indigo Room, Inc., Raimond Aulen, and Dylan Jones (collectively, "Appellants"), appeal the district court's grant of summary judgment in favor of defendants-appellees the City of Fort Myers ("City"), Fort Myers Police Chief Douglas Baker, and Fort Myers Police Officer Alain Gagnon (collectively, "Appellees"). Appellants sued Appellees under 42 U.S.C. § 1983 for alleged ongoing and threatened violations of their First, Fourth, and Fourteenth Amendment rights, resulting in part from the City's enforcement of an ordinance prohibiting persons under the age of twenty-one from entering certain alcohol-serving establishments. After careful review of the record and consideration of the parties' arguments, we affirm the entry of summary judgment in favor of Appellees.

**I.**

Aulen is the owner of the Indigo Room, a commercial business in downtown Fort Myers, Florida, that serves food and alcoholic beverages. Aulen opened the Indigo Room in 1996 and has been active in local politics since that time. He alleges that in September 2011 he increased his political activity, much of which was critical of the City and the police department, causing the Appellees to retaliate against him.

2

In 2011, during the alleged violations, Jones was nineteen years old and a member of "Occupy Fort Myers."[1] He asserts that he was cited by police for violating the underage-persons ordinance in retaliation for attending one of Aulen's political events at the Indigo Room. Before addressing the merits, we first summarize the evidence relevant to Appellants' political activity, Appellees' alleged retaliatory conduct, and Appellees' awareness of Appellants' political activity.

## A.    Appellants' Political Activity

In September 2011, Aulen became actively involved with two groups known as Wake Up Fort Myers ("Wake Up") and Find a Better Way for Lee County ("Find a Better Way"), which supported an anti-discrimination amendment to the City's charter that prohibited, among other things, discrimination against persons based on age once they reach the age of majority. In particular, Aulen took issue with Fort Myers, Fla., Code § 6-83 (the "Ordinance"), which provides, "It shall be unlawful for persons under the age of 21 years to enter or remain in any alcoholic beverage establishment, or to be permitted to do so by owners, managers, employees or independent contractors of alcoholic beverage establishments, except

---

[1] "Occupy Fort Myers" was an unincorporated association of individuals who had gathered in Fort Myers, Florida, to bring visibility to the influence of private money on the nation's political process through symbolic, around-the-clock, peaceful protests referred to as "occupations." *Occupy Fort Myers v. City of Fort Myers*, 882 F. Supp. 2d 1320, 1324 (M.D. Fla. 2011).

3

as . . . provided." The City enforced that Ordinance against what it deemed to be alcohol-serving nightclubs, including the Indigo Room, to preclude 18-to-20-year-old people from patronizing them. In support of the amendment initiative, Aulen held voter-registration drives at the Indigo Room from September 2011 until the November 2011 election.

In addition, around this time, Aulen was interviewed on the local television news and was critical of the mayor of Fort Myers. Aulen also sent an email to "concerned citizens," claiming that the police department was ineffective and unresponsive in certain respects. Later, Aulen was the leader of a charter-amendment effort to consolidate the police with the Lee County Sheriff's Office.

Aulen and Jones were both affiliated with Occupy Fort Myers ("Occupy"), and Aulen sometimes partnered with Occupy to host events at the Indigo Room. On November 17, 2011, Aulen held a petition drive to request an ethics investigation into the current mayor. Jones, who was wearing an Occupy t-shirt, and several other Occupy members entered the Indigo Room to sign the petition, signed the petition, and immediately exited. When Jones left the Indigo Room, Gagnon and Officer Najar were outside talking with members of Jones's group who had left before Jones. The officers asked the group for identification, stating that individuals coming out of the Indigo Room looked like they were under twenty-one. Jones then admitted that he was under twenty-one and received a

4

citation for violating the Ordinance.  The other individuals in Jones's group were over twenty-one and were not cited.  Aulen, who also was wearing an Occupy t-shirt and was listed as the alcoholic-beverage-license holder for the property, was cited under the Ordinance as well.

As a result of these political activities, Aulen asserts, the City retaliated against him and his business by disproportionately increasing the number of inspections and citations to which it subjected them.  Jones contends that the citation that he received on November 17, 2011, was in retaliation for exercising his First Amendment rights.

## B.    Appellees' Alleged Retaliatory Conduct

The police department conducts warrantless administrative inspections at alcohol-serving businesses in downtown Fort Myers, such as the Indigo Room, to ensure compliance with alcoholic-beverage laws.  These inspections are authorized by statute.  *See* Fla. Stat. § 562.41.  The police department conducts planned operations, usually initiated by the officer or officers responsible for patrolling the area, as well as unplanned inspections, while on patrol.  Baker, as Chief of Police, does not personally select businesses for administrative inspections or determine the frequency of those inspections.  He has directed that inspections not be limited to a single geographic area.

5

Gagnon testified that, as a bike-unit officer in downtown Fort Myers, he is responsible for conducting inspections of alcohol-serving establishments in the area. Generally, he decides which locations will be targeted in a planned operation. There are no guidelines to determine the frequency of administrative inspections, although he often conducts them in response to reports of underage presence at the locations. The inspections generally take less than an hour and are conducted by at least two officers. All alcohol-serving establishments in the downtown area are inspected. According to both Baker and Gagnon, the frequency with which a given establishment is inspected is linked to past violations. If police find violations at a particular place, they are more likely to return to ensure compliance.

According to Aulen, the Indigo Room did not permit entry to underage persons from 2002, when the Ordinance went into effect, until September 2011. In the fall of 2011, however, Aulen took the position that the Indigo Room qualified for an exemption under the Ordinance as a "*bona fide* restaurant," which would have allowed him to admit persons under twenty-one.[2] Then, Aulen held three "18 and up" events at the Indigo Room in September 2011. After the second of these

---

[2] A "*bona fide* restaurant" is an establishment "engaged primarily in the service of food and nonalcoholic beverages, where the sale or service of alcoholic beverages is incidental to the sale and service of food and nonalcoholic beverages," and meets certain criteria. Fort Myers, Fla., Code § 6-81. A judge later found that the Indigo Room did not qualify as a *bona fide* restaurant.

6

events, Gagnon brought Aulen copies of the Ordinance, explained that persons under twenty-one could not enter the Indigo Room, and informed Aulen that he would be cited for violating the Ordinance if he again allowed entry to underage persons.  Aulen responded that he intended to continue hosting 18-to-20-year-old people at the Indigo Room on Tuesdays.  True to his word, on September 27, 2011, Aulen held a third "18 and up" event.  Police visited the Indigo Room during the event and issued five citations for Ordinance violations.  In an email to his superiors, Gagnon explained that, although twenty to thirty underage people were present at that event, he issued only five citations to Aulen.  Gagnon further opined that he was "sure you will hear about this sooner than later knowing Aulen."  No additional "18 and up" events were held after the one on September 27.  According to Aulen, however, officers showed up every Tuesday in October 2011 to ask patrons for identification.

On January 7, 2012, police officers, including Gagnon, conducted an inspection of the Indigo Room in conjunction with the Florida State Division of Alcoholic Beverages and Tobacco.  Officers had received information that underage persons were drinking alcohol and using fake identification at the Indigo Room.  Four underage girls were cited.  Aulen was not present on this occasion, but was issued four citations on January 12, 2012, for the underage girls' presence in the Indigo Room on January 7.

Aulen testified that he had not seen "a lot of activity from the police or code enforcement prior to my political activity.  And then suddenly I was getting visits from them constantly."  He also described the police presence as "excessive."  According to Aulen, Gagnon sometimes would inspect the Indigo Room multiple times on a single night.  Baker testified that departmental policy allows an officer to enter an alcohol-serving establishment more than once in a single night.

According to police department records, officers issued thirty-seven total citations for Ordinance violations in 2011, six of them to Aulen and one to Jones.  Five of the citations issued to Aulen were given on September 27, 2011[3], and one was given on November 17, 2011, when Jones received his citation.  For comparison, one other establishment received six citations and two others received five citations in 2011.  In 2012, officers issued twenty-one total citations for violations of the ordinance.  Aulen received six of these citations, four on January 12, 2012, one on April 26, 2012, and one on December 1, 2012.  Gagnon confirmed that other establishments have been cited under the Ordinance and stated that one other establishment had more citations than the Indigo Room.  Neither Aulen nor the Indigo Room received any citations in 2013.

---

[3]  It appears that the citations technically were issued on September 28, 2011, likely early in the morning, but arose out of Aulen's third "18 and up" event held on the evening of September 27.  The date September 27 will be used for all citations related to this event.

8

Appellants contend that the record supports the inference that Gagnon conducted an administrative search or inspection of the Indigo Room 88 times since the fall of 2011. They base their position on the fact that Gagnon testified that he visited the Indigo Room on "official business" about one hundred times since 2008 and that he also testified that he conducted around a dozen inspections of the Indigo Room from 2008 to September 2011. Subtracting the twelve visits from the 100, Appellants assert that Gagnon testified to inspecting the Indigo Room 88 times since September 2011.

The district court found that Appellants mischaracterized Gagnon's testimony, and that, in context, "visits" for official business was a much broader category than "searches or inspections." In this regard, Gagnon prefaced his answer to the question about how many times he was "at the Indigo Room on official business" by stating, "I don't know. It's a lot of times. I mean, sometimes they call us to—to be there for something. . . ." In addition, during the same deposition testimony on which the Appellants relied to argue that Gagnon had conducted 88 inspections of the Indigo Room, Gagnon actually answered the specific question, "[F]rom September 1st, 2011, to the present, how many times have you conducted a warrantless administrative search or inspection at the Indigo Room, to detect the possible violation of the City's underage persons ordinance?" Gagnon responded, "I would say ten." Thus, the district court determined that,

9

when viewed in context, Gagnon's testimony that he had visited the Indigo Room 100 times included all of the times that he had been at the Indigo Room, including when he had been there at the Indigo Room's request.

## C.    Appellees' Awareness of Appellants' Political Activity

Appellants argue that the City was monitoring the political activity at the Indigo Room, that Baker was actively involved in directing police activity toward the Indigo Room, and that Gagnon was motivated by animus toward them.  We review the evidence relating to these contentions.

With respect to the City, it appears that some officials within the City forwarded an email Aulen sent entitled, "More downtown Shootings.  Another black eye for merchants,"  which was critical of the police department.  It is unclear to whom Aulen sent the email; he asserts that it was sent to "concerned citizens."  The forwarded emails contain no negative comments toward Aulen.

The record also contains City Council minutes relating to the anti-discrimination ballot measure and to the charter-amendment measure to merge the police department with the Sheriff's Office.  A few of the council members described the anti-discrimination measure as an attempt to change the City Code prohibiting persons under twenty-one from entering alcohol-serving establishments.  Finally, in an email dated January 11, 2013, one of the council members responded to an email from a "concerned Businessowner" complaining

10

about Aulen and the Indigo Room. The council member stated that there are "ongoing issues with the Indigo Room" and that the concerns identified in the email would be placed on the next City Council agenda.

Baker and Gagnon both testified that they had no knowledge of Aulen's or Jones's political activity with respect to Wake Up, Find a Better Way, or Occupy Fort Myers, at the time of the supposed retaliatory conduct. According to Baker, the first time he heard about the petition drive was at the deposition, he had no knowledge that Aulen was targeted for his political activity, and he did not know Jones before this case. Communications between Baker and others show that Baker had been informed of the inspections and citations at the Indigo Room and numerous other establishments, and that he had directed officers, through a subordinate, to "[w]rite a citation for EACH underage person[,] [n]ot just a few of them," if they "encounter any more issues with Ray or the other clubs." Baker also received updates on the Occupy movement. One officer visited the Indigo Room's Facebook page, viewed its photo album, and identified underage persons.

Gagnon was listed as one of the recipients of an email on September 25, 2011, that noted that Aulen was involved in the political group Wake Up, which wanted "to allow 18 and up in the clubs," and directed the email recipients to "be careful" enforcing the Ordinance because it would not be surprising if Aulen was cited and then called to talk to the media about it. Gagnon was not asked about

11

this email during his deposition, and the copy contained in the record appears to have been obtained from another listed recipient, so it is unknown whether or when Gagnon received or reviewed the email. In emails sent on September 25 and 26, 2011, however, Gagnon requested information about the Indigo Room's licenses and occupant capacity, in an apparent attempt to investigate Aulen's claim that the Ordinance did not apply to the Indigo Room since he was operating the Indigo Room a *bona fide* restaurant, "even though he's operating as a nightclub."

Aulen videotaped the police inspection conducted on September 27, 2011. Soon after, Aulen posted a video, entitled "Human Rights Violated by Police Raid at Indigo Room Mix Tape Tues 9-27-11," on YouTube. Gagnon emailed his supervisor about the video on October 6, 2011, stating:

> This libelous statement is directed toward me personally and Aulen's associate made sure my name on my shirt was visible as you can see toward the end of the video. There are civil laws prohibiting such defamation. Do you think our city legal department should look into this matter and serve Aulen with a letter or possibly take civil action against Aulen?

Regarding the proposed merger of the police department with the Sheriff's Office, Gagnon testified he first heard about the merger proposal in the summer of 2013. He further stated that he did not know that Aulen was the chairperson of the group supporting the merger. Gagnon admitted that he believed that the merger would negatively affect his job.

12

## II.

Appellants filed a ten-count civil-rights complaint under § 1983. Counts I-IV were facial challenges to the Ordinance, seeking permanent injunctive relief against the City. The district court denied Appellants' motion for a preliminary injunction with respect to these counts. On appeal, this Court affirmed the denial of injunctive relief, holding that the Ordinance does not infringe on Appellants' First Amendment rights and it is not unconstitutionally vague. *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1299-302 (11th Cir. 2013). The district court subsequently granted unopposed summary judgment in favor of the City with respect to these counts. That left Counts V-X, which are the subject of this appeal.

Aulen and Jones alleged First Amendment retaliation claims against the City (Count V), and against Baker (Count VI) and Gagnon (Count IX) in their individual capacities. Aulen and the Indigo Room alleged violations of the Fourth Amendment against Baker (Count VII) and Gagnon (Count X) in their individual capacities. Finally, all plaintiffs alleged First Amendment viewpoint discrimination against Gagnon in his individual capacity (Count VIII). Baker and Gagnon raised the defense of qualified immunity.

The district court granted summary judgment in favor of Appellees on the remaining counts, finding no violation of a constitutional right, and, even if a

13

violation occurred, the individual defendants were entitled to qualified immunity. Appellants bring this appeal, challenging the court's resolution of Counts V-X.

## III.

We review *de novo* a district court's grant of summary judgment, applying the same legal standards that governed the district court. *Bradley v. Franklin Collection Serv., Inc.*, 739 F.3d 606, 608 (11th Cir. 2014). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50, 106 S. Ct. 2505 (citations omitted).

In making this determination, we consider the record and draw all reasonable inferences in the light most favorable to Appellants, the non-moving parties. *See Bradley*, 739 F.3d at 608; *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013). "[W]hen conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version." *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (*en banc*) (emphasis omitted).

## IV.

14

We first analyze Appellants' claims against the individual defendants, Baker and Gagnon. We then turn to Appellants' claims against the City.

## A.    Claims Against the Individual Defendants

### 1.    *Unreasonable Warrantless Administrative Inspections*

Aulen and the Indigo Room argue that summary judgment should have been entered in their favor on their Fourth Amendment claims that they were subjected to an excessive number of warrantless inspections. Because there was no justification for the increased police activity, Appellants assert, the administrative searches were unreasonable and simply a pretext to harass and intimidate Aulen.

The Fourth Amendment's prohibition against unreasonable searches applies to administrative inspections of private commercial businesses. *Donovan v. Dewey*, 452 U.S. 594, 598, 101 S. Ct. 2534 (1981). Warrantless administrative inspections "do not offend the Fourth Amendment if they are necessary in order to monitor closely regulated businesses for the purpose of learning whether a particular business is conforming to the statute regulating that business." *Bruce v. Beary*, 498 F.3d 1232, 1239 (11th Cir. 2007). Liquor establishments, including nightclubs and bars like the Indigo Room, are "closely regulated." *Crosby v. Paulk*, 187 F.3d 1339, 1346-48 (11th Cir. 1999); *see Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77, 90 S. Ct. 774 (1970).

15

Administrative inspections may be unreasonable if they do not have a "properly defined scope." *Bruce*, 498 F.3d at 1240 (quotation marks omitted). The primary purpose of the Fourth Amendment in this context "is to protect citizens from the 'unbridled discretion [of] executive and administrative officers.'" *Id.* (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 323, 98 S. Ct. 1816 (1978)).

Appellants do not argue that Gagnon had no authority to conduct administrative inspections of the Indigo Room to ensure compliance with alcoholic-beverage laws, or that the statute authorizing such searches violates the Fourth Amendment. *See Crosby*, 187 F.3d at 1346-48 (concluding that a similar Georgia statute satisfied the requirements of the Fourth Amendment). Rather, their argument rests on the contention that the number of searches was excessive and, therefore, unreasonable. This contention, in turn, is based on the inference Appellants draw from Gagnon's testimony that Gagnon conducted 88 inspections of the Indigo Room between September 2011 and August 2013.

We conclude that the evidence is insufficient to raise a genuine issue of material fact with respect to the reasonableness of the warrantless inspections under the Fourth Amendment. We respectfully reject Appellants' assertion that Gagnon testified that he searched or inspected the Indigo Room 88 times since September 2011. At his deposition, Gagnon testified that he visited the Indigo Room on "official business" about 100 times since 2008, and he specifically stated

that he had conducted about ten inspections of the Indigo Room since September 2011. Gagnon did not testify that he conducted 100 inspections from September 2008 through 2013. Nor does Aulen point to any other evidence contradicting Gagnon's statement that he executed about ten inspections of the Indigo Room between September 2011 and 2013, other than Aulen's general description of the increase in police activity as "huge" or "excessive." This vague testimony has little probative value as to the number of inspections actually conducted.

There is similarly no "significantly probative" evidence in the record to support Appellants' contention that the inspections were for a purpose other than learning whether the Indigo Room was conforming to the alcoholic-beverage laws, including the Ordinance. *See Anderson*, 477 U.S. at 248, 106 S. Ct. 2505; *Bruce*, 498 F.3d at 1239-40. The City admitted that the Indigo Room experienced some additional police activity beginning in September 2011, which Appellants argue was because of Aulen's increased political activity. But Aulen himself concedes that he held three "18 and up" nights at the Indigo Room on Tuesdays in September in violation of the Ordinance. One such event was held after Gagnon specifically told Aulen that the events violated the Ordinance and that if he continued to hold them in the future, he would receive citations for violations. Then Aulen advised Gagnon that he intended to continue to hold such events in the future.

17

Consistent with the policy of returning to inspect an establishment found in violation to ensure compliance, officers went to the Indigo Room every Tuesday in October to check patrons' identification. Officers also searched the Indigo Room in January 2012 after receiving information that underage persons were drinking alcohol and using fake identification at the Indigo Room, and this search turned up four additional violations of the Ordinance. Thus, despite Appellants' contentions on appeal, the City presented evidence of a pattern of violations with respect to underage persons at the Indigo Room that provided a legitimate basis for the increased police activity.

We do not find Appellants' reliance on *Bruce* persuasive. *Bruce* favorably cited a Fourth Circuit case holding that it was unreasonable for officers to perform over 100 inspections of a particular bar, when there was no evidence in the record to support the need for such repeated searches. *Bruce*, 498 F.3d at 1245 (citing *Turner v. Dammon*, 848 F.2d 440, 446 (4th Cir. 1988)). First, contrary to Appellants' contentions and for the reasons previously discussed, the record in this case, unlike in the Fourth Circuit case, does not support the notion that Gagnon and other Fort Myers Police Department officers conducted 100 inspections, or even 88 of them, between September 2011 and 2013. Second, *Bruce* noted that the record in the Fourth Circuit case contained only the officers' "unsubstantiated statements" in support of the need for the searches. Here, by contrast, the reasonableness of the

18

repeated inspections was objectively supported by record evidence. Third, this Court in *Bruce* addressed a situation where the defendants' inspections exceeded the scope of authority conferred by statute. *See Bruce*, 498 F.3d at 1248. Here, Appellants' challenge is to the frequency of Gagnon's inspections; they do not assert that the inspections exceeded the scope of authority granted by Fla. Stat. § 562.41.

For these reasons, we affirm the grant of summary judgment on Counts VII and X.

### 2. First Amendment Retaliation Claims

Appellants argue that a jury could find that Baker and Gagnon used city ordinances to harass and intimidate them in retaliation for their political activity. According to Appellants, both Baker and Gagnon exhibited animus toward Aulen.

To state a First Amendment retaliation claim under § 1983, a plaintiff must establish the following: (1) his speech or conduct was constitutionally protected; (2) the retaliatory conduct of the defendant adversely affected the protected speech, in that the retaliation "would likely deter a person of ordinary firmness" from engaging in the protected speech; and (3) there is a causal connection between the retaliatory conduct and the protected speech. *O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011); *Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005).

19

The causal-connection inquiry asks whether the defendants were subjectively motivated to retaliate because the plaintiffs engaged in protected speech. *O'Bryant*, 637 F.3d at 1217. Subjective motivation in turn requires that the defendants had actual knowledge of the plaintiffs' protected speech, which can be established by circumstantial evidence. *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798-800 (11th Cir. 2000) (for a retaliation claim under the Family and Medical Leave Act, the plaintiff generally must show that the decision maker was aware of the protected conduct at the time of the adverse action). Circumstantial evidence of temporal proximity alone is insufficient when there is unrefuted testimony from the defendant that he knew nothing of the protected conduct. *Id.* at 799-800.

After a careful examination of the entire record, we conclude that no reasonable jury could find even circumstantial evidence sufficient to return a verdict favorable to Jones and Aulen on their retaliation claims.

With respect to Jones, the alleged retaliation complained of—a single citation for violating an ordinance prohibiting persons under the age of twenty-one from entering certain alcohol-serving establishments—is insufficient under the circumstances to "deter a person of ordinary firmness" from engaging in the protected speech. *O'Bryant*, 637 F.3d at 1212. We previously have held that the Ordinance, on its face, does not infringe upon the Appellants' First Amendment

rights. *Indigo Room*, 710 F.3d at 1300. Jones remains free to engage in similar political speech, but he simply cannot do so in establishments that primarily derive their sales from alcoholic beverages consumed on the premises—until he reaches the age of twenty-one. *See id.*

Moreover, the record evidence is insufficient to support an inference that Jones's protected activity—signing the ethics petition and assembling with other members of Occupy Fort Myers—was a motivating factor behind the citation. Jones arrived in Fort Myers only a week before he received the citation, and Baker testified that he had no prior knowledge of Jones, his political activity, or the ethics petition drive at the Indigo Room. Nor does any evidence in the record tend to contradict Baker's assertions in this regard. Therefore, no reasonable jury could conclude that Baker was subjectively motivated to retaliate against Jones because he signed the ethics petition. *See Brungart*, 231 F.3d at 799-800.

As for Gagnon, although he did have actual knowledge that Jones was an Occupy member, we disagree that the evidence could support an inference that Jones was targeted for his affiliation with Occupy or the signing of the ethics petition. First, Gagnon testified that he went to the Indigo Room on routine patrol, and Appellees have pointed to no evidence in the record to contradict that. Second, as recounted previously, just a few weeks earlier, Aulen had advised Gagnon that he intended to continue to host events that welcomed 18-to-20-year-

21

old people, in violation of the Ordinance.  Third, when Gagnon encountered Jones coming out of the Indigo Room, a place that the Ordinance required him to be at least 21 to have entered, Jones admitted that he was underage.  Fourth, the officers' interaction with the members of the group that Jones was with was limited to checking their identification.  Fifth, both Jones and the other persons in his group all had left the Indigo Room and all had signed the ethics petition, so, presumably, under Appellants' reasoning, all of them took the same position that was contrary to Gagnon's liking.  Yet only Jones, who was the only one under 21 and who, as a result, was in violation of the Ordinance, was cited for violating a law.  Quite simply, there is nothing about these facts that suggests that Jones was targeted because of his participation in Occupy or his signing of the ethics petition.

With respect to Aulen's claims against Baker, Appellants have not identified any record evidence showing that Baker was aware of Aulen's political activity and acted in response to it, either by directing subordinates to engage in unlawful actions or by failing to stop them from acting unlawfully.  *See Keating v. City of Miami*, 598 F.3d 753, 764-65 (11th Cir. 2010) (for a supervisor to be liable under § 1983, plaintiffs much establish a causal connection between the actions of the supervising official and the alleged constitutional violation).  Baker does not personally select establishments for administrative searches.  And, although Baker knew of inspections at the Indigo Room and directed officers to issue citations to

22

any underage person found in any alcohol-serving establishment, there is no support for the contention, other than sheer speculation, that Baker knew that the searches were allegedly conducted in retaliation for protected speech. Accordingly, the district court properly granted summary judgment in favor of Baker on Count VI.

Regarding Aulen's claims against Gagnon, it is a closer question whether a reasonable jury could infer from the circumstances, taken as a whole, that Aulen's political activities were a motivating factor in Gagnon's decisions to inspect the Indigo Room and to cite Aulen for violating the Ordinance. The record contains some evidence supporting Aulen's contention that Gagnon was motivated to retaliate against Aulen. Specifically, after Aulen posted to YouTube a video from the September 27, 2011, inspection, claiming that Gagnon violated human rights during the "police raid," Gagnon emailed his supervisor about the possibility of initiating legal action against Aulen. Yet, aside from that email, there is little, if any, evidence of a causal connection between Aulen's political speech and Gagnon's conduct.

Nonetheless, even assuming that a reasonable jury could infer that Gagnon was subjectively motivated to retaliate against Aulen for some of his political speech, the record is clear that Gagnon would have taken the same actions in the absence of Aulen's protected activity. *See O'Bryant*, 637 F.3d at 1217; *Smith v.*

23

*Mosley*, 532 F.3d 1270, 1278-79 (11th Cir. 2008).  In particular, Gagnon testified that all alcohol-serving establishments in the downtown area are inspected and that other owners were cited under the Ordinance.

Indeed, Gagnon's reports show that he and other officers regularly conducted compliance reviews of numerous establishments in a single evening. For example, on September 30, 2011, the Gagnon's report shows that the officers contacted ten businesses, none of which were the Indigo Room.  Similarly, over a two-day period from January 12 to 13, 2012, the officers inspected fourteen businesses, including the Indigo Room.  On February 25, 2012, the officers visited ten businesses to conduct underage checks, including the Indigo Room.  Three days later, on February 28, 2012, the officers "made contact with" fifteen businesses, none of which included the Indigo Room.  On March 16, 2012, they "made contact with" fourteen businesses, again, none of which included the Indigo Room.  None of this evidence was contradicted by anything else in the record.

Other unrefuted record evidence showed that, in 2011, Aulen was not cited for Ordinance violations more than other establishments that apparently did not participate in the same political activities as Aulen.  Furthermore, the particular inspections evidenced in the record—on September 27, 2011, Tuesdays in October 2011, January 7, 2012, April 26, 2012, and December 1, 2012—were linked either to specific unlawful conduct at the Indigo Room or to planned police operations

24

involving multiple alcohol-serving establishments.  Consequently, we conclude that Aulen could not prevail before a reasonable factfinder on his claim of First Amendment retaliation again Gagnon.  We therefore affirm the district court's grant of summary judgment in favor of Gagnon as to Count IX.

### 3.    *Viewpoint Discrimination*

Appellants argue that the district court erred in granting summary judgment on their claim for First Amendment viewpoint discrimination because, on November 17, 2011, the police cited only Aulen and Jones, who were both wearing Occupy t-shirts at the time.  We disagree.  The Ordinance, on its face, does not infringe upon the Appellants' First Amendment rights, and there is no record evidence supporting an inference that the Ordinance violated Appellants' rights as applied in these circumstances.  *Indigo Room*, 710 F.3d at 1300.  Accordingly, the court properly granted summary judgment on Count VIII.

### B.    Claims Against the City

A local government is liable under § 1983 for its policies and customs that cause constitutional torts.  *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 784, 117 S. Ct. 1734 (1997) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018 (1978)).  Because we have concluded that no constitutional violation occurred in this case, the City cannot be held liable.  To the extent that the claim against the City alleges constitutional harm apart from what has been

25

discussed above, after reviewing the entire record, we find the record evidence insufficient for a reasonable jury to infer that the City had a policy or custom that caused, or was the "moving force" behind, the purported constitutional violations. *See City of Oklahoma v. Tuttle*, 471 U.S. 808, 819-24, 105 S. Ct. 2427 (1985).

## V.

In sum, we hold that the district court properly granted summary judgment in favor of Appellees on Counts V-X.[4]   Accordingly, we affirm the judgment of the district court.

**AFFIRMED.**

---

[4]  Because we have concluded that no constitutional right was violated, we do not address the district court's alternative ruling that the individual defendants would have been entitled to qualified immunity even if they had violated Appellants' constitutional rights.

26