[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12616
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cv-00253-LMM

WBY, INC., d.b.a. FOLLIES,
JOSHUA SCHINDLER,
STEVE YOUNGELSON,

Plaintiffs - Appellees,

versus

DEKALB COUNTY, GEORGIA,

Defendant – Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(March 13, 2019)

Before WILSON, ROSENBAUM, and HULL, Circuit Judges.

PER CURIAM:

DeKalb County, Georgia (the "County"), appeals the denial of its motions for judgment as a matter of law and for a new trial after a federal jury found that the County violated the constitutional rights of WBY, Inc., d.b.a. Follies ("Follies"), an adult-entertainment club, during an unannounced, warrantless inspection at Follies on April 19, 2013.  The jury found that the inspection, which involved a total of thirty-six officials, some dressed in army fatigues or masks, violated Follies's Fourth Amendment right to be free from unreasonable searches and seizures.  The district court then denied the County's motions for judgment as a matter of law and a new trial, finding that sufficient evidence supported the verdict and that the trial errors asserted by the County did not warrant a new trial.  After careful review, we affirm.

## I.  Factual Background

### A.  General Background

Follies is an adult entertainment club in unincorporated Dekalb County that offers nude dancing and serves alcohol.  Follies was granted "non-conforming status" to provide these services in a prior settlement agreement with the County. As part of the settlement, Follies otherwise agreed to be bound by the County's Adult Entertainment Ordinance ("Ordinance").  See DeKalb Cty. Code §§ 15-400–15-424.

The Ordinance proscribes certain conduct in adult clubs and regulates licensing of the clubs and permitting of employees.  Among other things the Ordinance requires, all employees working at adult-entertainment clubs must have

a permit that is available for inspection on premises. DeKalb Cty. Code § 15-405. A permit applicant must provide his or her legal name, any aliases, and "date of birth with written proof thereof," among other information. *Id.* § 15-405(e). The permit includes the employee's photograph and legal name.

DeKalb County Code § 15-420 authorizes County officials, including representatives of the police, fire, finance, and health departments, "to inspect the premises to ensure compliance" with the Ordinance. At the time of the inspection in this case, § 15-420 limited inspections to between the hours of 8:00 a.m. and 5:00 p.m. Other provisions authorize inspections to verify compliance with alcohol laws. O.C.G.A. § 3-2-32; DeKalb Cty. Code § 4-26.

*B. The "Aggressive Enforcement" Plan*

The DeKalb County Police Department's ("DKPD") vice unit is tasked with regulating the activities of adult-entertainment clubs. It fulfills that responsibility through both overt and covert operations. Overt operations include checking licenses and permits. Covert operations include utilizing undercover detectives to patronize the locations and monitor the activities for violations of the Ordinance.

In early 2013, Lieutenant Curtis Williams, the commanding officer of the DKPD's vice and narcotics units, determined that "more aggressive enforcement" of the Ordinance was needed. Williams wrote a memorandum to Police Chief Cedric Alexander detailing his plans.

3

According to Williams's memo, "current investigations" by the vice unit had revealed criminal conduct—including disorderly conduct, prostitution, drug trafficking, and drug use—at adult clubs across the county. Williams intended to "combat the illicit activities taking place at these establishments" by beginning "more aggressive enforcement" of county ordinances. This "renewed focus" on "illicit activity" was to, in Williams's view, "have the desired effect of reducing the overall crime rate within unincorporated DeKalb County."

The plan was to be executed as follows. Vice-unit detectives would conduct "overt compliance checks" of the five adult clubs located in unincorporated DeKalb County beginning on April 13, 2013. Williams envisioned checking each club "a minimum of 10 times per month at various times of day and night." Williams planned to have the vice unit conduct the license and permit checks in coordination with representatives of the permits section, the code-compliance unit, and the fire marshal. Because it did not have access to the license and permits database, the vice unit needed a representative of the permits section present "to identify those persons with and without valid permits." Additionally, Williams stated, the permit checks could be used "to positively identify any club employees we may have charges on from undercover investigations." Chief Alexander approved the plan.

*C. The Inspection at Follies*

4

The "overt compliance check" at Follies took place on Friday, April 19, 2013. Just before 5:00 p.m., various marked and unmarked law-enforcement vehicles descended on Follies, blocking the entrance to its parking lot.  Over the next two hours, thirty-four County employees—including the SWAT unit's twelve-member "Strike Force," every detective in both the vice and narcotics units, a permits-unit officer, ordinary uniformed officers, and code-compliance officials—and two Georgia Department of Revenue agents conducted what the County says was an administrative inspection and what Follies characterizes as a criminal raid.

Initial entry into the club was made by ten members of the Strike Force.  The Strike Force was dressed in "Battle Dress Uniform"—camouflage pants and shirts and black boots—and visibly carrying holstered side-arms.  Some Strike Force members wore black vests with "POLICE" on the front or back.  The Strike Force was followed by other members of the inspection party, some wearing masks to conceal their faces.  Uniformed officers remained outside to watch the entrances and provide security.

Officers spread out around the club, yelling at everybody to "shut the fuck up," "sit down," and "don't move."  Follies was a "packed house," near its maximum occupancy of 236 persons—inclusive of customers and Follies's staff.[1]  After

---

[1] The County asserts that 236 patrons were permitted in Follies, plus additional employees and entertainers.  But the operations manager at Follies, Steven Shine, testified that the "maximum

5

turning on the house lights and shutting off the music, officers ordered all entertainers to go to a small dressing room.

Approximately fifty-five female entertainers were working that day. As the entertainers were assembling, officers spoke with the "house mom," who kept track of the entertainers' permits and work schedule, telling her to "shut the fuck up, have a seat, be quiet, get your girls together, and nobody fucking move." Around this same time, the house mom saw one of the entertainers be "put to the floor to be arrested" for talking on her phone. This entertainer was arrested for obstruction.

Vice officers had the entertainers form a line and, working with the house mom, checked each of the entertainers' permits and forms of identification one at a time. In addition to checking permits, the officers also took a photograph of each entertainer holding a white board listing the entertainer's legal name, dance name, and date of birth. Williams testified that the white-board photographs would allow for easier arrests through undercover activities without involving the permits section, which maintained the permits database. This process lasted until past 7:00 p.m. No entertainer was cited for not having a permit. After these events, according to the house mom, a third of the entertainers stopped working at Follies.

capacity" at Follies was "236 persons." Viewed in the light most favorable to the jury verdict, "persons" includes both patrons and staff.

6

Meanwhile, in the public area of the club, officers were directing employees to Follies's bar area. Follies's operations manager, Steven Shine, identified himself and asked the officers what they were doing there. He was told to go to the bar area or face arrest for obstruction. Shine started walking down the steps toward the bar and was shoved in the back by an officer. Around the same time, Shine saw Follies's part-owner, Steve Youngelson, being handcuffed, detained, and escorted out of Follies in what seemed to be a "pain hold"—raising his arms up behind his back so there was pressure on his shoulders. Youngelson was forced to remain outside the club for thirty minutes, and, although he has colitis, he was not permitted to use the restroom and defecated in his pants. Youngelson was not charged with any crime. A member of Follies's inside security team testified that no one checked whether he had a permit, and he did not, in fact, have one.

Patrons were detained for approximately twenty to thirty minutes. After this time, they were strongly encouraged to leave unless they wanted to hang around with a "whole bunch" of police officers. By the end of the enforcement action, no customers remained.

The inspection yielded six arrests. An entertainer and a patron were arrested for obstruction. Another person, who had not entered Follies and was outside in his car, was arrested on a probation violation. One entertainer was arrested for prostitution based on conduct viewed by undercover officers before the inspection.

7

A valet working in the Follies parking lot was arrested for disorderly conduct. And a patron was arrested for possession of marijuana based on conduct viewed by undercover officers. A few other persons were detained but ultimately released.

In addition to the arrests, officers issued three citations for prohibited sexual contact, based on conduct seen by undercover officers before the inspection, and two citations for servers not having an alcohol-server permit. In addition, Youngelson was cited for selling cigarettes illegally, and code compliance found several violations including a blocked fire exit, exposed wires, and no business license.

### D. Prior and Subsequent Inspections

Before 2013, administrative inspections at Follies were brief, "completely cooperative," and involved no more than six officers. No members of the SWAT team were involved. Two officers watched the front and back doors while the other officers conducted the permit and license checks. With regard to the prior permit checks of entertainers, a small number of officers worked with the house mom to check entertainers' permits. Entertainers were brought to the house mom three to five at a time. According to the house mom, the officers "would just physically have the girl in front of me, I would pull the permit out, they would check the name, look at the girl, look at the permit, put it back in the book, send them on their way." These checks lasted no longer than an hour and did not interrupt business. Patrons generally were unaware the checks were happening.

8

Despite Williams's plan to check adult entertainment clubs "a minimum of 10 times per month," no similar inspections were undertaken after April 2013.

*E. Other Evidence before the Jury*

In addition to testimony and documentary evidence, the jury saw multiple videos of parts of the inspection, including video footage recorded by the DKPD inside of Follies. The district court found that the DKPD videographer searched "though almost every inch of [Follies]—both public and private areas—including the kitchen, looking through cabinets and even inside of the refrigerator and freezer."

## II.  Procedural History

In January 2014, Follies sued the County based on the enforcement action at Follies on April 19, 2013, alleging violations of its First and Fourth Amendment rights.[2]  As relevant here, the district court determined that enough evidence existed to submit Follies's Fourth Amendment claim—that the inspection was an unreasonable search and seizure—to a jury for resolution.

A jury considered this claim at a five-day trial in January 2018. The district court denied the County's motions for judgment as a matter of law after Follies's case and at the close of all the evidence. The jury returned a verdict in favor of Follies, finding that the County had violated Follies's right to be free from

---

[2] Follies was joined below by Youngelson, Follies's part-owner, and Joshua Schindler, a valet working at Follies on April 19 who was arrested for disorderly conduct. These claims are not at issue here.

unreasonable search and seizure, and awarded compensatory damages in the amount of $10,392.

After trial, the County filed a motion for judgment as a matter of law, *see* Fed. R. Civ. P. 50(b), or, alternatively, for a new trial, *see* Fed R. Civ. P. 59(a).  In seeking judgment as a matter of law, the County argued that the evidence was insufficient to establish a constitutional violation because, in the County's view, the inspection was reasonable in scope and execution and was not a pretext for a criminal investigation. In seeking a new trial, the County argued that the verdict was against the great weight of the evidence and that trial errors affected its substantial rights.  As relevant here, the County contended that the district court had improperly excluded certain statistics of 911 calls concerning Follies and permitted Follies's counsel to cross-examine a County witness about studies not in evidence.

The district court denied these motions.  The court concluded that the evidence was sufficient to show either that the administrative inspection was pretextual or that it was unreasonable in scope and execution.  Either theory, the court explained, was sufficient to support the jury's general verdict finding a constitutional violation. Further, the court concluded that the jury's verdict was not against the great weight of the evidence and that, while the court did not believe that it had erred, the alleged errors did not affect the County's substantial rights.  The County now appeals.

### III.  Standards of Review

10

We review *de novo* the denial of a motion for judgment as a matter of law, applying the same standards as the district court. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010).  Judgment as a matter of law is appropriate only when "the facts and inferences point so overwhelmingly in favor of one party that reasonable people could not arrive at a contrary verdict." *Id.* (citation, quotation marks, brackets, and ellipsis omitted).  In making that determination, we review the entire record, but we draw all reasonable inferences in favor of the non-moving party and do not assume the jury's role of weighing the evidence or making credibility determinations.  *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2010)).  We credit evidence supporting the moving party that is uncontradicted and unimpeached, at least if it comes from disinterested witnesses, but we "disregard all evidence favorable to the moving party that the jury is not required to believe." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1312 (11th Cir. 2013) (quotation marks omitted).

We review the denial of a motion for new trial for an abuse of discretion. *Id.* Likewise, we review for an abuse of discretion a court's decision to exclude evidence for discovery violations, *Goodman-Gable-Gould Co. v. Tiara Condo. Ass'n, Inc.*, 595 F.3d 1203, 1210 (11th Cir. 2010), and its rulings on the permissible scope of cross-examination, *Bryan v. Hall Chem. Co.*, 993 F.2d 831, 836 (11th Cir. 1993). To warrant a new trial based on any trial error, the appellant must establish that the

error affected its "substantial rights." *See* Fed. R. Civ. P. 61. "To satisfy this standard, [the appellant] bears the burden of proving that the error probably had a substantial influence on the jury's verdict." *Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1352 (11th Cir. 2007).

## IV. Discussion

### A. *Motion for Judgment as a Matter of Law*

The sole question we must address in resolving the County's motion for judgment as a matter of law is whether sufficient evidence supports the jury's finding of a Fourth Amendment violation. The County does not contest its liability as a municipality in the event a constitutional violation is established. *See*, *e.g.*, *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Its protections apply to "commercial premises, as well as to private homes." *New York v. Burger*, 482 U.S. 691, 699 (1987). In general, a search of a home or business must be based on a warrant supported by probable cause. *See id.* at 702. "The basic premise of search and seizure doctrine is that searches undertaken without a warrant issued upon probable cause are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically

established and well-delineated exceptions." *Swint v. City of Wadley*, 51 F.3d 988, 995 (11th Cir. 1995) (quotation marks omitted).

One of those limited exceptions involves administrative inspections of "closely regulated" industries. *See Burger*, 482 U.S. at 702. Because an owner or operator of commercial property "has a reduced expectation of privacy" in this context, the standard for what may be reasonable under the Fourth Amendment is correspondingly broader. *See id.* at 702–03. All here agree that adult-entertainment clubs are "closely regulated" industries.

Where, as here, a law authorizes warrantless inspections of closely regulated businesses "but makes no rules governing the procedures that inspectors must follow, the Fourth Amendment and its various restrictive rules apply." *Bruce v. Beary*, 498 F.3d 1232, 1240 (11th Cir. 2007). To satisfy the Fourth Amendment, an administrative inspection must be "appropriately limited" in both scope and execution and may not serve as a backdoor for undertaking a warrantless search unsupported by probable cause. *Id.* at 1239–40. "As with any search, then, the scope and execution of an administrative inspection must be reasonable in order to be constitutional." *Id.* at 1244. In this regard, "an administrative screening search must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it." *Id.* at 1248 (quotation marks omitted).

1.    Prior Cases Involving Administrative Inspections

13

We have on three prior occasions considered whether an administrative inspection was reasonable under the Fourth Amendment.[3]  First, in *Swint v. City of Wadley*, we reviewed the constitutionality of two law-enforcement raids on a nightclub.  51 F.3d at 998–99.  The raids were executed with the aid of SWAT team members, several of the officers pointed their weapons at patrons, and the club patrons and employees were searched and detained for over an hour and a half.  *Id.* at 993.  Based on these facts, we rejected the officers' contention that the searches were valid administrative inspections, specifically noting that the "massive show of force and excessive intrusion" displayed during the raids far exceeded that of previous administrative inspections of the club.  *Id.* at 999.

A few years later, we held in *Crosby v. Paulk* that an administrative inspection of a nightclub was reasonably executed.  In *Crosby*, forty law enforcement officers searched a pair of adjoining nightclubs that were suspected of violating underage drinking laws.  187 F.3d 1339, 1343–44 (11th Cir. 1999).  The officers detained and then "checked the identifications of approximately 400 patrons, many of whom were underage college students consuming alcoholic beverages."  *Id.* at 1343, 1348.  The investigation lasted about two hours and resulted in fifty-four convictions for underage drinking.  *Id.* at 1343.  No officer "drew a weapon or threatened the

---

[3] A decision in a fourth case, *Berry v. Leslie*, 767 F.3d 1144 (11th Cir. 2014), was vacated upon this Court's grant of *en banc* rehearing, *see Berry v. Orange Cty.*, 771 F.3d 1316 (11th Cir. 2014).  Since the case was eventually settled, no *en banc* opinion issued.

arrestees or any patrons." *Id.* Based on these facts, we concluded that the inspections were reasonably conducted, noting that the large law-enforcement presence "was required to secure the premises so that patrons would not leave while identifications were being checked for underage consumers of alcohol." *Id.* at 1348.

More recently, in *Bruce v. Beary*, we found that a purported administrative inspection of an auto-body repair shop was unreasonable. 498 F.3d at 1236. The search involved a group of twenty officers who surrounded the premises and blocked all of the exits. *Id.* Some of the officers were dressed in SWAT uniforms with ballistic vests. *Id.* The officers entered the shop with guns drawn, ordering all of the employees to line up along a fence. *Id.* Then the officers patted down and searched the employees. *Id.* Under these circumstances, we held that the search, which was more akin to a criminal raid than a routine inspection, exceeded the bounds of the Fourth Amendment. *See id.* at 1245. As the inspection of books and records "does not require exits to be blocked, an automatic shotgun to be stuck into an employee's back, employees to be lined up along a fence and patted down and deprived of their identification," we concluded that the search far surpassed its statutory authorization and was constitutionally unreasonable. *Id.*

These cases demonstrate that courts must examine the totality of the circumstances in order to determine whether an administrative inspection, just like any other search or seizure, is reasonable under the Fourth Amendment. *See United*

15

*States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012) ("It is by now axiomatic that a court must examine the totality of the circumstances in order to determine whether a search or seizure is reasonable under the Fourth Amendment.").  And, to reiterate, "[t]o meet the test of reasonableness, an administrative screening search must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it." *Bruce*, 498 F.3d at 1248 (quotation marks omitted).

2.    The April 19, 2013 Inspection at Follies

As detailed above, the Ordinance at the time of the Follies inspection in April 2013 authorized County representatives from the police, finance, health, and fire departments "to enter the premises of any adult entertainment establishment . . . between the hours of 8:00 a.m. and 5:00 p.m. to ensure compliance with the provisions of this article."  Follies does not dispute that this Ordinance authorized the County to conduct warrantless inspections of adult-entertainment clubs, nor does it contend that the Ordinance itself is constitutionally impermissible.

Instead, Follies maintains, and the jury found, that the April 19, 2013 inspection violated the club's Fourth Amendment right to be free from unreasonable search and seizure.  In denying the County's motion for judgment as a matter of law, the district court found that two alternative and independent theories supported the jury's general verdict:  (1) the administrative inspection was a pretext to investigate for general criminal activity, and therefore *per se* unreasonable; and (2) the

16

inspection was unreasonable in scope and execution.[4]  The County contests both rulings.  We agree that the latter theory is properly supported by the evidence at trial, so we need not and do not consider the pretext theory.[5]

The County argues that the inspection was not unreasonable in scope and execution because the show of force was reasonably necessary to ensure the safety of officers, patrons, and employees in light of the dangers posed by adult-entertainment clubs generally and Follies in particular, as well as the number of people officers expected to encounter.[6]  Further, the County asserts that it was authorized to search the "entire premises," that the length of the inspection was not unreasonable, and that the conduct of the officers was not unreasonably threatening or violent because no weapons were drawn.

---

[4] We note that the district court, in denying the County's motion for judgment as a matter of law, appears to have inadvertently included some facts, such as the presence of officers from the gang and intelligence units, about an inspection conducted by the County at another adult-entertainment club as part of the same "aggressive enforcement" plan.  This error is harmless because our review is *de novo*.  *See Brown*, 597 F.3d at 1173.

[5] The County asserts that the district court erred by considering the subjective motivations of Williams, who developed the "aggressive enforcement" plan at adult entertainment clubs in unincorporated DeKalb County.  The County maintains that the pretext inquiry turns on the primary purpose of the Ordinance that authorized the administrative inspection, not the subjective motivations of the officers involved.  Because we conclude that a jury could reasonably find that the inspection was objectively unreasonable, we need not resolve this issue.

[6] The County's argument that Follies consented to the inspection at issue is a non-starter.  In its settlement agreement with the County, Follies agreed to be bound by certain provisions of the Ordinance, including the inspection provision.  But that Follies consented to administrative inspections under this provision tells us nothing about whether the inspection that took place here was reasonable under the Fourth Amendment.  *See Bruce*, 498 F.3d at 1240, 1244 ("Although a statute authorizing administrative searches may be constitutional, actual searches conducted under that authority may not.").

17

Here, we affirm the denial of the County's motion for judgment as a matter of law because the evidence at trial and the reasonable inferences that could be drawn from that evidence do not "point so overwhelmingly in favor of one party that reasonable people could not arrive at a contrary verdict." *Brown*, 597 F.3d at 1173. Specifically, a jury could reasonably conclude from the evidence that the County violated Follies's right to be free from unreasonable administrative search and seizure.

The evidence at trial showed that the inspection of Follies involved a total of thirty-six officials, including twelve members of the SWAT unit's Strike Force, every detective in both the vice and narcotics units, a permits-unit officer, ordinary uniformed officers, code-compliance officials, and two state-revenue agents. The Strike Force was armed and wearing army fatigues, and some officers wore masks. The officers yelled at patrons and employees using unprovoked profanity, shoved an employee who was complying with officer commands, and removed the part-owner from the club in a "pain hold" and refused to permit him to use the restroom despite his medical condition. Patrons were ordered to sit and be quiet and were not permitted to leave for at least twenty minutes. All fifty-five of Follies's entertainers were ordered to line up and submit to individual photographs in which they were required to hold up a whiteboard displaying their legal name, stage name, and date of birth, a process that lasted two hours. An entertainer was "put to the floor" and

18

arrested for talking on her cell phone as the entertainers were assembling. Operations at Follies were completely shut down for approximately two hours.

Based on this evidence, viewed as a whole and in the light most favorable to Follies, the jury reasonably could have concluded that the inspection of Follies was unreasonable in scope and execution.

First, the jury was not required to believe the County's evidence that the extensive and intimidating police presence was reasonably necessary to ensure the safety of officers, patrons, and employees. The County claims that the number of officers was reasonable because adult-entertainment clubs are dangerous places and that, just days before the inspection, officers responding to a shots-fired call at Follies saw members of Follies's outside security staff with AR-15 rifles.

The jury, however, heard testimony from several witnesses that prior administrative inspections had been conducted much differently and without incident. *See Swint*, 51 F.3d at 998–99 (holding that an administrative inspection was unreasonable in part because "[a]dministrative inspections conducted on the Club and its predecessor establishment both before and after the two raids at issue in this case were accomplished without the massive show of force and excessive intrusion witnessed in [the raids]"). Prior inspections did not include the use of SWAT officers, were conducted by six officers at most, were "completely cooperative," and did not disrupt operations or alert the patrons. Plus, the County

19

abandoned the "aggressive enforcement" plan after the April 2013 inspection at issue here, casting doubt on the administrative needs the County asserted justified the plan. A jury could reasonably conclude from this evidence that officers did not have "reason to believe that their inspection would be met with resistance or defiance," *Bruce*, 498 F.3d at 1245, whether from patrons or Follies's staff.

Second, the jury reasonably could have concluded that the number of officers was grossly disproportionate to the administrative needs that justified the inspection. In this regard, the County relies on our decision in *Crosby*, where we found that the number of officers involved was reasonably proportionate because the officers needed to "check the identifications of approximately 400 patrons, many of whom were underage college students consuming alcoholic beverages." *Crosby*, 187 F.3d at 1348. That type of painstaking process required a large number of officers to complete efficiently and effectively. Here, in contrast, the officers ostensibly were there to conduct license and permit checks, which did not necessarily require interaction with patrons. Some of the checks simply involved verifying publicly posted information. And, again, the jury heard evidence that prior checks had been conducted successfully without incident and with far fewer officers.

Third, the jury reasonably could have concluded that the inspection was unreasonably extended for a purpose aside from the administrative needs that justified the inspection. *See Bruce*, 498 F.3d at 1248. Specifically, the jury heard

evidence that the officers detained the fifty-five entertainers, for up to two hours, to take their photographs for the vice unit's ad hoc database. This process was unnecessary to check the entertainers' permits, which already contained the entertainers' photographs and, in the past, had been checked quickly in groups of three to five entertainers. And Lieutenant Williams, who developed the plan to take these photographs, testified that the photographs would make future criminal investigations easier.

Fourth, we disagree with the County that the lack of evidence showing the officers' use of firearms is dispositive. While the officers did not draw or point weapons, they did engage in other intimidating behavior, such as shoving or grabbing employees, wearing masks, and using unprovoked profanity and aggressive language. Because we evaluate reasonableness under the "totality of the circumstances," the fact that no weapons were drawn, though certainly relevant, does not alone sink Follies's claim. *See Lewis*, 674 F.3d at 1303.

Finally, the County argues that it need not use the least intrusive means, simply reasonable means. While it is "not our role to tell local governments how to conduct an administrative search," *Crosby*, 187 F.3d at 1348, the Fourth Amendment still requires that such inspections be reasonable, *Bruce*, 498 F.3d at 1244. And we hold, for the reasons explained above, that a jury reasonably could have concluded that the inspection here "resembled a criminal raid" more than a "regular, routine"

21

administrative inspection. *See Bruce*, 498 F.3d at 1244. We therefore affirm the denial of the County's motion for judgment as a matter of law.

### B. *Motion for a New Trial*

We next consider the County's arguments that the district court should have granted a new trial based on two alleged trial errors: (1) excluding 911 call statistics about Follies based on discovery violations; and (2) permitting Follies's counsel to cross-examine a County witness about studies not in evidence. Neither contention warrants a new trial.

### 1.    Exclusion of 911 Call Statistics

The County first challenges the district court's decision to exclude two documents containing computer-aided dispatch ("CAD") statistics. It says that the statistics, showing dozens of 911 calls from Follies in the weeks leading up to the search, were important evidence of the dangers posed in executing the administrative inspection at Follies.

In its order denying the County's motion for new trial, the district court explained that these documents were "excluded for three reasons": (1) "they were produced late after discovery had closed and after initially having told [Follies] they did not exist"; (2) "after these same documents had been excluded at the summary judgment stage, the County had failed to take any action to remedy the late production, such as proposing a reopening of discovery, in the two-and-a-half years

22

since that order leading up to trial"; and (3) the court was concerned that the County wanted to use the statistics to show the officers' state of mind regarding the danger they anticipated in conducting the inspection, but "the record showed that no officer could specifically remember the dispatch calls at issue."

Under Rule 37(c), Fed. R. Civ. P., "a district court may preclude a party from introducing evidence that was not disclosed as required by Rule 26(a), (e)(1), or (e)(2) unless the failure was harmless or there was substantial justification for the failure." *Goodman-Gable-Gould Co.*, 595 F.3d at 1210. The County does not dispute that it failed to disclose the CAD statistics as required or that it had no substantial justification for the failure. Instead, the County maintains that the lack of timely disclosure was harmless because Follies was aware of the statistics well before trial.

Although Follies may have been aware of the evidence, the County does not address the district court's finding that additional discovery would have been necessary to remedy the County's failure to produce the evidence. Based on that finding, the district court reasonably concluded that the non-disclosure was not harmless, particularly in light of the court's justified concerns about how the County intended to use the evidence. The court's decision to exclude this evidence was not an abuse of discretion.

2. Scope of Cross-Examination

23

The County next asserts that the district court abused its discretion by permitting Follies's counsel to question Williams on cross-examination about whether he was familiar with studies showing that strip clubs are safer than other nightclubs. The court permitted this brief questioning over the County's objection, and it later explained that it permitted the questioning because it was aware of the studies on which Follies's counsel based the questions.

Federal Rule of Evidence 611(b) provides that "[c]ross examination should not go beyond the subject matter of the direct examination and matters affecting the witness' credibility." "[C]ounsel may ask a question of a witness if he has a good-faith basis to ask it. A good-faith basis does not have to be 'definitive proof,' and may be based on inadmissible evidence." *Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300, 1312–13 (11th Cir. 2014) (citations omitted).

Here, the district court did not abuse its discretion in permitting the cross-examination. *See Bryan*, 993 F.2d at 836. On direct, the County asked Williams if he was aware of studies showing detrimental effects of adult clubs, which the County had relied on in enacting the Ordinance. In turn, the court properly permitted Follies to briefly question Williams whether he was aware of studies showing the opposite. *See* Fed. R. Evid. 611(b). Further, given that the district court was aware of the studies on which counsel based the cross-examination, it reasonably found that counsel had a good-faith basis to ask the questions, even if it did not explain its

24

ruling contemporaneously.  In any case, the County has not shown that erroneously permitting two brief questions on cross-examination about studies that were not discussed in any detail, in the context of the week-long trial as a whole, "probably had a substantial influence on the jury's verdict." *Proctor*, 494 F.3d at 1352.

Accordingly, the district court did not abuse its discretion in denying the County's motion for a new trial.

## V.  Conclusion

In sum, we affirm the district court's order denying the County's motions for judgment as a matter of law and for a new trial.

**AFFIRMED.**

25